JUDGE WOOD

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

CARTICA MANAGEMENT, LLC, CARTICA
CORPORATE GOVERNANCE FUND, LP,
CARTICA INVESTORS, LP, and CARTICA
CAPITAL PARTNERS MASTER, LP

                  Plaintiffs,

     v.

CORPBANCA S.A., ÁLVARO SAIEH
BENDECK, CORP GROUP BANKING S.A.,
COMPAÑÍA INMOBILIARIA Y DE
INVERSIONES SAGA LIMITADA, JORGE
ANDRÉS SAIEH GUZMÁN, FERNANDO
AGUAD DAGACH, JORGE SELUME
ZAROR, RAFAEL GUILISATI GANA,
FRANCISCO LEÓN DÉLANO, FRANCISCO
MOBAREC ASFURA,  GUSTAVO
ARRIAGADA MORALES, JOSÉ LUIS
MARDONES SANTANDER, HUGO
VERDEGAAL, MARÍA CATALINA SAIEH
GUZMÁN, ANA BEATRIZ HOLUIGUE
BARROS, FERNANDO MASSÚ TARE, and
EUGENIO GIGOGNE MIQUELES

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - x

14 CV 2258

No. 14-CV-_____



RECEIVED
APR 0 1 2014
U.S.D.C. S.D. N.Y.

### COMPLAINT

Plaintiffs Cartica Management, LLC, Cartica Corporate Governance Fund, LP, Cartica

Investors, LP, and Cartica Capital Partners Master, LP (collectively, "Cartica") bring this action

under the federal securities laws against CorpBanca S.A. ("CorpBanca" or the "Bank"), its

controlling shareholder Álvaro Saieh Bendeck  ("Saieh"), his holding companies Corp Group

Banking S.A. ("CGB") and Compañía Inmobiliaria y de Inversiones Saga Limitada ("Saga")

(together, "CorpGroup"), and certain CorpBanca officers and its directors (collectively, "Defendants").[1]

## SUMMARY OF ACTION

1.      This action involves the machinations of billionaire Álvaro Saieh who, in the face of a distressed financial situation, orchestrated together with the other Defendants a fraudulent scheme to convince holders of CorpBanca shares and related securities that CorpBanca was receiving and evaluating offers to enter a corporate transaction to benefit all shareholders equally.  In reality, and contrary to the misleading and incomplete disclosures the Defendants made in their public filings in the United States and communications with Plaintiffs, Defendants were actively soliciting, negotiating, and ultimately entering a transaction that, through a series of inequitable special benefits accruing only to Álvaro Saieh and Defendants, accomplished a bailout for CorpGroup, which had suffered significant losses in connection with one of Álvaro Saieh's privately held businesses, supermarket chain SMU, at the cost of devaluing securities owned by minority shareholders, including Cartica.

2.      Defendants entered a change-in-control transaction with Itaú Unibanco ("Itaú") in January 2014, but thereafter made only summary, limited disclosures in securities filings.  The day after the transaction announcement, Defendants provided limited disclosures about the transaction via a public call open to all investors.  Plaintiffs learned later that Defendants had already made other disclosures via an early morning meeting with only certain chosen

---

[1]   CorpBanca's Board comprises nine directors and two alternate directors, including Jorge Andrés Saieh Guzmán, Fernando Aguad Dagach, Jorge Selume Zaror, Rafael Guilisati Gana, Francisco León Délano, Francisco Mobarec Asfura, Gustavo Arriagada Morales, José Luis Mardones Santander, and Hugo Verdegaal as directors, and María Catalina Saieh Guzmán and Ana Beatriz Holuigue Barros as alternate directors (collectively, "Director Defendants").  CorpBanca's chief executive officer is Fernando Massú Tare and its chief financial officer is Eugenio Gigogne Miqueles (together, "Officer Defendants").

shareholders, but not Cartica.  As a key component of their scheme to defraud minority shareholders, Defendants Saieh and CorpGroup also failed to make proper securities filings regarding their agreement with Itaú to act as a group and hold CorpBanca shares for the purpose of effecting a change in control. To date, Saieh and CorpGroup continue to flout U.S. securities laws by refusing to file a Schedule 13D, which requires them to provide full and complete disclosure regarding their agreements and intentions in effecting a change in control at CorpBanca.  After depriving CorpBanca minority shareholders of critical and price moving information for more than a month following the transaction, on March 14, 2014 Defendants—cowed by public outcry—disclosed certain aspects of the transaction and certain shareholders agreements but not other material agreements (and have yet to file a Schedule 13D or provide additional material information and agreements).

3.      The recently disclosed transaction and shareholders agreements confirm that the agreement between CorpGroup and Itaú is a fraud-ridden transaction in which Saieh has, in exchange for control of the Bank, secured cash, both short- and long-term liquidity, and highly valuable long-term put and call rights for himself to the detriment of the minority shareholders. The agreements contain provisions that give Saieh at least the following special benefits that will not inure to the benefit of the minority shareholders:

> (i) a sweetheart buyout of CorpBanca Colombia shares owned by CorpGroup and its co-investors at an inflated purchase price of $894 million;

> (ii) a nearly one billion dollar credit line from Itaú at a preferential interest rate;

> (iii) director and officer appointment rights;

> (iv) veto rights over certain actions by the post-merger bank;

> (v) tag-along, first offer, and share liquidity rights;

> (vi) highly valuable put and call rights, giving risk-free access to potentially huge profits;

(vii) effective guaranteed cash dividends to CorpGroup for the next eight years;

(viii) financing and/or five-year look back options to participate in new business opportunities of the new bank; and

(ix) rights to exchange its post-merger shares for valuable shares in the post-merger bank's parent company, Itaú.

4.        Another egregious component of Saieh's scheme, and perhaps the one with the most unquantifiable and long-term consequences, is the restrictions the deal places on the post-merger bank's capital structure to the detriment of value for both the bank and shareholders.  To secure certain preferential rights, Saieh has forced mandatory capital limitations on CorpBanca that will restrict the bank's capital structure for at least the next eight years.  For example, rather than leave capital structure and deployment determinations to the Board and management so that they can assess the market in real time and optimally use capital, Saieh has ensured he will receive a continuous flow of cash through mandatory dividends that come at the expense of "achieving a growth rate of the [Bank's] total assets" as determined by the Board.  This mandatory and sub-optimal use of the post-merger bank's capital will irreparably sacrifice long-term value for both the bank and its shareholders in order secure cash for Saieh.  Similarly, the five-year look back options will irreparably harm the bank's long term valuation.

5.        Absent injunctive relief halting this transaction, the Bank's capital structure and market valuation will be restricted for years to come and a significant portion of the value of the securities owned by minority investors, including Cartica, will be irrevocably transferred to Saieh—richly rewarding him and the other Defendants for their deception and bringing their fraudulent scheme to fruition.  Furthermore, injunctive relief is warranted here to sterilize the Saieh- and CorpGroup-held shares of CorpBanca until (i) they file the full and complete disclosures required in a Schedule 13D, and (ii) the market has sufficient time to receive, review, and correct for those disclosures.

\*        \*        \*

6.      CorpBanca is Chile's fourth largest bank, excluding state-owned BancoEstado, in terms of loans and deposits as of December 2013.  CorpBanca is controlled by Saieh, who indirectly owns a majority of CorpBanca's common shares and related securities via his holding companies, which include Defendants CGB and Saga.  CorpBanca is one of a handful of core businesses operated by Saieh through various holding companies.  Another core entity is SMU. In the first nine months of 2013, SMU experienced a very public financial implosion.  It disclosed accounting irregularities and sustained over $720 million dollars in losses in the first three quarters of 2013.  These losses forced SMU to default on its bond obligations. Recognizing that the familiar blue logo of Saieh's empire adorned not just SMU but also CorpBanca, the market reacted and the "financial contagion" of SMU soon tainted CorpBanca as well.  This financial contagion was further exacerbated by an investigative news report in July 2013 that exposed several CorpGroup-related special purpose investment vehicles that Saieh had engineered to clandestinely channel money from CorpBanca to SMU.  As a result of this scandal, local pension funds sold down their significant holding of the Bank's shares. In mid-2013, CorpBanca's bonds were downgraded by several ratings agencies, including Moody's, which lowered its debt rating from Baa2 to Baa3.  At the same time, CorpBanca's shares hit a three-year low.

7.      In response, in order to save Saieh's crumbling empire, Defendants, led by Saieh, developed a scheme to manipulate the markets for CorpBanca's securities, including

CorpBanca's American Depository Shares ("ADSs")[2] publicly traded on the NYSE, in order to extract value from minority shareholders to bestow on Saieh and CorpGroup. This fraudulent scheme was designed to address and resolve CorpGroup's impaired financial condition, a crisis for Saieh that resulted in large part due to the financial floundering of SMU. Indeed, in August 2013, SMU received a massive infusion of capital, mostly from Saieh, with the potential need for similar, future infusions of capital—taxing financial obligations that were enormous even for a purported billionaire like Saieh.

8.    In November 2013, Defendants announced that CorpBanca had received several acquisition offers, which Defendants were evaluating in order to determine an "appropriate counterparty . . . and transaction structure." Defendants' short and vague disclosure came only after market rumors of a transaction emerged and the Chilean securities regulator instructed CorpBanca to update the investing public.

9.    The November announcement was contrary to the Bank's disclosures regarding two significant acquisitions it made in Colombia in 2012. In its annual report, the Bank disclosed that it was shifting gears and focusing on a strategy of "organic growth" in its banking operations in order to improve integration and thereby extract value from resulting efficiencies. Defendants also made repeated assurances to the public, investors, and Chilean and U.S. securities regulators that the Bank was operating for the benefit of the owners of the Bank's common shares based on equal treatment of each share.

---

[2]    Each CorpBanca ADS represents 1,500 shares of CorpBanca common stock. The ADSs are evidenced by certificates known as American Depositary Receipts ("ADRs"). The term "ADR" is commonly used to mean both the certificates and the securities themselves and refers in this complaint to both instruments.

10.     Defendants were counting on the fact that shareholders would hold onto their shares in hopes of a sale or similar transaction that treated and benefited all shares equally. In truth and undisclosed to minority shareholders, Defendants were actively seeking opportunities to extract both short- and long-term value from CorpBanca for the controlling shareholders to the detriment of minority shareholders. Saieh and the other Defendants had no intention of entering a straightforward transaction tied solely to a per-share valuation and were instead negotiating an extremely complex transaction that Saieh—who earned a Ph.D. in economics from the University of Chicago—was financially engineering to extract maximum value from CorpBanca for himself. As part of this scheme, Defendants' disclosures about a potential deal were intentionally misleading and incomplete.

11.     In November 2013, December 2013, and January 2014, Defendants filed with the U.S. Securities and Exchange Commission ("SEC") short, single-paged, vague disclosures regarding preliminary "transaction" discussions, but nowhere stated that Defendants were ignoring their publicly and privately stated obligations to achieve equal treatment and value for each share.

12.     In December, media reports surfaced indicating that Saieh and the Bank would only accept a bid that allowed Saieh to retain some control of CorpBanca. Alarmed by these reports, Cartica initiated communications with Saieh directly. On December 9, 2013, Cartica's Managing Director Teresa Barger met with Saieh in his New York apartment and office. Cartica, through Barger, explained directly to Saieh that the goal of any CorpBanca transaction must be to secure the highest value for *all* shareholders. Cartica further explained that any transaction reflecting special control benefits for Saieh that did not inure to all shareholders equally would unacceptably and unlawfully shift both short- and long-term value from minority

shareholders to Saieh.  On December 20, 2013, in a formal letter to Saieh, Cartica reiterated the singular importance of securing the highest value for *all* shareholders equally.

13.     In response to these admonitions from Cartica, Saieh specifically affirmed to Cartica that he would *not* seek personal benefits but, consistent with CorpBanca's legal disclosures and legal obligations, he would seek and negotiate for the maximum benefit for all shareholders.  Based on these direct representations, Cartica decided to not only maintain its large minority position in CorpBanca but to purchase additional CorpBanca securities.

14.     On January 29, 2014, Defendants announced they had agreed to merge with Itaú (the "Itaú Transaction").  Despite the fundamental nature of this corporate transaction, Defendants' announcement provided only minimal details about the deal and the Spanish and English versions of those disclosures did not match.  Nevertheless, even the scant disclosures Defendants provided made clear that Saieh had carved out numerous financial rights that singularly benefitted CorpGroup and himself to the short- and long-term detriment of minority shareholders.  The market reacted swiftly to this partial unveiling of Defendants' scheme: CorpBanca's ADRs tumbled from a closing price of $19.35 before the announcement of the Itaú Transaction to $16.35 the next day.  For almost a month and half following the merger announcement, Defendants refused to provide additional information on the deal's particulars, gamesmanship that further manipulated the market by depriving it of full and fair disclosure. Indeed, the market for CorpBanca ADRs remained depressed.

15.     As Defendants no doubt planned, the announcement of the Itaú Transaction corresponded perfectly with the start of a month-long summer vacation for most Chileans. Accordingly, media, analyst, and investor reactions in Chile to the Itaú Transactions were largely absent for much of February.  All that changed in March, when the market refocused, began to

analyze the Itaú Transaction in more detail, and started objecting to its harmful short- and long-term consequences for shareholders.  The announcement of the Itaú Transaction also took place at a time of change in Chilean government, as the new president was sworn in on March 11, 2014 and with her appointments to high-level government positions, including the heads of the banking and securities regulators, taking office thereafter.

16.     On March 14, 2014, after much protest by analysts and minority shareholders including Cartica, as well as numerous press reports, Defendants finally published the merger agreement ("Transaction Agreement") and a shareholders agreement ("Shareholders Agreement"), but not other material deal and shareholders agreements.  Importantly, Defendants failed to disclose (i) any of the Itaú Transaction's accompanying schedules, exhibits, or supporting valuations, or (ii) any of the clandestine side agreements or the credit facility agreement tied to the Itaú Transactions, some of which Plaintiffs are only just now hearing of a full two months after the Transaction's announcement.  Despite the selective disclosure, the Transaction Agreement and Shareholders Agreement provide a further window into Defendants' true actions.  Rather than negotiate for a price that treated and benefitted all shares equally—as Saieh had personally represented to Cartica, and as his son, CorpBanca's Chairman, represented on the public conference call that followed the announcement of the Itaú Transaction—Defendants concocted a deal specifically designed to siphon numerous, inequitable, and valuable special short- and long-term benefits to Saieh and CorpGroup, including:

- The post-merger bank's purchase of all CorpBanca Colombia shares held by CorpGroup for $329 million and CorpGroup's co-investors for an additional $565 million, a purchase prices far in excess of fair market value—and a buyout that, apart from providing Saieh with cash, serves no legitimate purpose in light of the post-merger bank's planned IPO of CorpBanca Colombia as described in the transaction agreement;

- The extension of an almost $1 billion credit line to CorpGroup at a highly favorable interest rate, which corresponds conveniently with the liquidity CorpGroup requires to shore up its other investments, including SMU;

- The post-merger bank's agreement to continue to contribute to Saieh's favored politicians; and

- The grant to CorpGroup alone of:

  - appointment rights for two Director slots, which Saieh has stated will be filled by his son, Jorge Andrés Saieh, as Chairman and his faithful lieutenant, CorpBanca CEO Fernando Massú, as a Director;

  - veto rights over certain actions by the post-merger bank;

  - tag-along rights, rights of first offer, and a share liquidity mechanism;

  - co-investment rights in any Itaú expansions into certain Latin American markets;

  - put rights ensuring CorpGroup's ability to cash out its ownership in the short term, but coupled with call rights that enable it to call back those same shares within five years not at subsequent market prices then prevailing but at the original put price (plus negligible interest);

  - effective guaranteed minimum cash dividend rights over the next eight years that includes an unusual dividend put agreement; and

  - share exchange rights enabling CorpGroup to trade its shares of the post-merger bank for direct shares of its much more liquid parent company, Itaú.

17. The market again reacted decisively to Defendants' disclosure (albeit, still incomplete and insufficient disclosure): CorpBanca's ADRs reached a new low, erasing minimal gains achieved in February and early March and closing at $16.15 per share as of March 14, 2014. The significant and sustained drop in the price of CorpBanca shares and ADRs since the Itaú Transaction was announced has made plain that the deal sacrificed minority shareholder value in favor of securing special benefits for Saieh, permitting him to save face by pretending he retained a modicum of control, and ensuring his son received a prestigious new job as Chairman of the post-merger bank.

18.     In sharp contrast, minority shareholders, now saddled with substantial short- and long-term injuries, have been greatly harmed.   In the short term, the Itaú Transaction has erased over $3.00 per share in value for each CorpBanca ADR.  In the long term, should the deal close, CorpBanca and its shareholders will suffer irreparable losses that are truly unquantifiable. CorpBanca shareholders will be denied the opportunity to maximize value through a proper transaction process that would have resulted in a higher valuation given the large number of deep-pocketed international suitors vying for this coveted asset.  They will also be stuck with artificial capital constraints and the prospect of after-the-fact dilution of successful new business opportunities.  Each of these harms is the product of deal provisions designed, negotiated, and secured by Saieh for his own benefit that will restrict the bank's capital structure for at least the next eight years, as its board and management would no longer be free to optimally deploy bank capital for maximum shareholder benefit.

19.     While the Itaú Transaction is labeled a merger, in reality it is a backdoor sale of CorpBanca designed to (i) enable Saieh to extract a control share premium via special benefits accruing solely to himself and no other shareholders, and (ii) transfer full control over to Itaú.  At the same time, Itaú and Defendants avoid a straight forward sale via a tender offer or similar mechanism that would value CorpBanca on an equal per share basis.

20.     Saieh financially engineered a sale of CorpBanca that he could technically term a merger, which enables him to bleed the Bank of significant short- and long-term value in order to:  (i) prop up CorpGroup in the wake of its SMU-related failures, (ii) provide CorpGroup with desperately needed liquidity, (iii) save face by avoiding a "fire sale," (iv) secure jobs for his son and a faithful lieutenant, and (v) through highly valuable put and call options, create substantial opportunities to profit from CorpBanca in the long term—opportunities that were not made

available to any other shareholders.  Of course, none of this was disclosed before the merger was announced, or even for weeks after the announcement, and Defendants have yet to disclose that each of the Saieh-specific benefits has been achieved at the expense of the minority shareholders of CorpBanca, one of the largest of which is Cartica.

21.     Furthermore, Defendants Saieh and CorpGroup have compounded their fraudulent acts above by failing to disclose that they formed a group with Itaú for the purposes of holding CorpBanca shares and voting those shares in favor of the Itaú Transaction.  Saieh's and CorpGroup's complete failure to make any filing disclosing their group activity with Itaú for purposes of effecting a change in control at CorpBanca has deprived the marketplace of full and complete disclosures regarding Saieh's and CorpGroup's machinations to secure numerous side benefits via the Itaú Transaction at the expense of the minority shareholders of CorpBanca, including Cartica.

22.     As Defendants acknowledge in their press release announcing their deal with Itaú, the Itaú Transaction is expressly subject to approval by U.S. regulators, as well as regulators in Chile, Brazil, Colombia, and Panama.  Given that the deal is the product of Defendants' fraud, Cartica brings this suit to enjoin Defendants from taking any further steps to close the Itaú Transaction and/or secure any regulatory approval for the deal and thereby:  (i) prohibit Defendants from benefiting from the fruits of their deception, (ii) ensure the Bank's capital is not artificially restricted for years to come by Saieh's preferential deal terms, and (iii) shift the value of the special benefits Saieh anticipated from the deal back to all CorpBanca shareholders on an equal basis—as Defendants originally led Cartica and other minority shareholders to believe would occur.

23.     Cartica likewise brings this suit to protect public investors by enjoining Saieh and CorpGroup from the ability to vote any of their CorpBanca shares until (i) they file the full and complete disclosures required in a Schedule 13D, and (ii) the market has sufficient time to absorb and respond to such disclosures after receiving, reviewing, and correcting for their belated 13D filings.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78aa and 78m(d)(3). This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337.  The claims asserted herein arise under Sections 10(b), 13(d), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(d), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rules 10b-5 (17 C.F.R. §240.10b-5), 13d-1 (17 C.F.R. § 240.13d-1), and 13d-5 (17 C.F.R. § 240.13d-5).

25.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C § 1391(b) and (c).  Many of the acts and transactions giving rise to the violations of law detailed in this complaint, including (i) the offer and sale of ADRs that have been listed on the New York Stock Exchange since November 1, 2004, (ii) the preparation and dissemination of to the public of materially false and misleading public filings, and (iii) Saieh's direct misrepresentations to Cartica, occurred in substantial part in this District.  In addition, Defendant CorpBanca has a U.S.-registered branch and transacts business in this district.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the U.S. mails, interstate telephone communications and the facilities of national securities exchanges.

27.     Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 because an actual controversy exists regarding Defendants' fraudulent scheme under Sections 10(b), 13(d), and 20(a) of the Exchange Act and SEC Rules 10b-5, 13d-1, and 13d-5.

## THE PARTIES

### A.    Plaintiffs

28.     **Plaintiff Cartica Management, LLC** is a Delaware limited liability company with its principal place of business at 1775 Eye Street NW, Suite 800, Washington DC 20006. Cartica is an investment advisor registered with the SEC.  It invests in mid-market companies in emerging markets on behalf its investors, which include several prominent public pension funds. Cartica takes significant, minority ownership stakes in a small number of companies via long-only equity purchases and then engages in dialogue with each company about improving corporate governance to achieve enhanced performance and maximum value for shareholders.

29.     **Plaintiffs Cartica Corporate Governance Fund, LP; Cartica Investors, LP; and Cartica Capital Partners Master, LP** (the "Cartica Funds") are each private investment funds managed by Cartica Management, LLC.  The Cartica Funds are the beneficial owners of the Cartica-controlled CorpBanca ADRs as well as additional CorpBanca shares.  Cartica Investors II, L.P., another fund managed by Cartica Management, LLC, is the beneficial owner of CorpBanca shares.

30.     Through the Cartica Funds, one of Cartica's significant and long-term investments has been CorpBanca.  In October 2012, Cartica began purchasing CorpBanca shares. In early January 2013, Cartica Managing Director Mike Lubrano spoke twice with Saieh by

telephone to discuss Cartica's investment in CorpBanca.  Based on those conversations, on January 18, 2013, Cartica participated in CorpBanca's public offering and purchased approximately 1.2 million ADRs in transactions in the United States, which reflect 1.8 billion CorpBanca shares that underlie those ADRs.

31.      In connection with SMU's and CorpBanca's downward financial spiral last summer, Cartica Managing Director Barger spoke with Saieh in July 2013 and exchanged emails with him in August 2013.  In reliance on Cartica's communications with Saieh and CorpBanca's public filings, Cartica held its CorpBanca shares and ADRs and purchased additional direct shares in CorpBanca throughout 2013.

32.      In December 2013, Barger met with Saieh in-person in New York.  Based on Saieh's representations about his intent to negotiate a deal that was fair for all shareholders, Cartica continued to hold its ADRs and purchased an additional 188 million CorpBanca shares.

33.      The Cartica Funds currently own 10,971,557,595 shares including both common shares and shares represented by ADRs.  These holdings represent approximately 3.22% of the Bank's outstanding shares.  Cartica is one of the largest minority shareholders in CorpBanca.

34.      Cartica has been harmed in the United States by the ADRs' significant diminution in value as a result of Defendants' fraudulent scheme and lack of fully transparent, honest and accurate disclosure of all the relevant terms of the Itaú Transaction, including all of the side benefits Saieh and/or the entities that he controls will receive.  Cartica will also be harmed irreparably if the Itaú Transaction is allowed to close by the lack of full and fair disclosure and by virtue of the unquantifiable damages Cartica will sustain as a result of the long-term capital restrictions the Itaú Transaction will force on the post-merger bank and other long-term benefits Saieh will receive.

**B.**    **Bank Defendant**

35.    Defendant CorpBanca, S.A. is a publicly traded company organized under the laws of Chile and licensed by the Chilean Superintendency of Banks and Financial Institutions to operate as a commercial bank.  Its legal and commercial name is CorpBanca.  CorpBanca's principal executive offices are located in Santiago, Chile.  CorpBanca also has a U.S.-registered branch, which is located at 845 Third Avenue, 5th Floor, New York, NY 10022-6601.  As of September 30, 2013, CorpBanca had 28 employees in the United States.

36.    CorpBanca stock is listed on the Santiago Stock Exchange and the Chilean Electronic Exchange under the symbol "CorpBanc."  As of December 31, 2013, CorpBanca had 340,358,194,234 common shares outstanding.  The Bank is subject to certain reporting requirements of the Chilean Superintendency of Securities and Insurance ("SVS") and files periodic reports known as material fact notices (*hecho esencial*).

37.    CorpBanca's ADRs are traded on the NYSE under the symbol "BCA," and the Bank is subject to periodic reporting requirements of the Exchange Act that apply to "foreign private issuers."  Accordingly, the Bank is required to file with the SEC annual reports on Form 20-F ("20-F") and periodic reports on Form 6-K ("6-K").

38.    As of December 2013, CorpBanca was the fourth largest, non-state-owned bank in Chile in terms of loans and deposits and ranks fifth in the Colombian banking industry.

**C.**    **Controlling Shareholder Defendants**

39.    **Defendant Álvaro Saieh Bendeck** is a 64-year-old Chilean businessman. According to media reports, Saieh has a personal net worth of $3 billion and holds a Ph.D. in economics from the University of Chicago.  Saieh owns property in this District located on the corner of East 67th Street and 5th Avenue in Manhattan.

40.     Saieh is the Chairman and controlling shareholder of privately held CorpGroup and, through CorpGroup and other investment vehicles, the controlling shareholder of CorpBanca.  According to public filings and media reports, CorpGroup has:  (i) a controlling interest in CorpBanca; (ii) a controlling interest in privately-held SMU, Chile's third-largest supermarket operator; (iii) a controlling interest in Copesa, a media conglomerate; and (iv) real estate and insurance operations.

41.     More specifically, as of December 31, 2013, Saieh controlled approximately 50.44% of CorpBanca's outstanding common shares through his holding companies, Corp Group Banking, S.A and Companía Inmobiliaria y de Inversiones Saga S.A., owned and controlled by Saieh and his family.

42.     According to CorpBanca's Form 20-F for year-end 2012, "Saieh Bendeck holds shares with sufficient voting power under Chilean law to approve substantially all of the forms of corporate action subject to decision by shareholders' meetings . . . , to elect a majority of the nine members of [CorpBanca's] Board of Directors, direct [CorpBanca's] management and control substantially all matters that are to be decided by a vote of shareholders, including fundamental corporate transactions."

43.     **Defendant Corp Group Banking S.A.** is a holding company controlled by Álvaro Saieh.  CGB is the controlling shareholder of CorpBanca.  As of December 31, 2013, it holds approximately 45.26% of CorpBanca's common shares.

44.     **Defendant Companía Inmobiliaria y de Inversiones Saga Limitada**, like CGB, is a holding company controlled by Álvaro Saieh.  As of December 31, 2013, Saga holds approximately 5.18% of CorpBanca's common shares.

**D.**     **Director Defendants**

45.     **Defendant Jorge Andrés Saieh Guzmán** is a Director of CorpBanca.  He became a Director on August 25, 1998.  Saieh Guzmán is the son of Álvaro Saieh.  On February 2, 2012, Saieh Guzmán became the Chairman of CorpBanca's Board of Directors, succeeding his father who was the previous Chairman.  He also serves as the Vice Chairman of Defendant CorpGroup.  Saieh Guzmán holds a B.A. in Business and Administration from the Universidad Gabriela Mistral as well as a Masters in Economics and an M.B.A. from the University of Chicago.  Saieh Guzmán appears to reside at the property owned by his father, Saieh, in this District located on the corner of East 67th Street and 5th Avenue in Manhattan.

46.     **Defendant Fernando Aguad Dagach** is a Director of CorpBanca.  He became a Director on June 18, 1996 and became CorpBanca's First Vice Chairman on February 2, 2012.  He is an investor in financial institutions.

47.     **Defendant Jorge Selume Zaror** is a Director of CorpBanca.  He became a Director on May 23, 2001 and became CorpBanca's Second Vice Chairman on February 2, 2012.  From 1996 through 2001, Selume served as CorpBanca's Chief Executive Officer.  Selume holds a B.A. in Business and Administration from the Universidad de Chile as well as a Masters in Economics from the University of Chicago.

48.     **Defendant Rafael Guilisati Gana** is a Director of CorpBanca.  He became Director on February 2, 2012.  He holds a B.A. in History from Universidad Católica de Chile.

49.     **Defendant Francisco León Délano** is a Director of CorpBanca.  He became a Director on May 31, 2011.  He holds an engineering degree from the Universidad Católica de Chile as well as an M.B.A. from Harvard University.

50.     **Defendant Francisco Mobarec Asfura** is a Director of CorpBanca.  He became Director on February 2, 2012.  He holds a B.A. in Business and Administration and an Accounting Auditor degree from the Universidad de Chile.

51.     **Defendant Gustavo Arriagada Morales** is a Director of CorpBanca.  He became a Director on September 28, 2010.  He holds a B.A. in Business and Administration and an Economics degree from the Universidad de Chile.

52.     **Defendant José Luis Mardones Santander** is a Director of CorpBanca.  He became a Director on March 12, 2013.  He holds a civil engineering degree from the Universidad de Chile as well as a Masters in Law and Diplomacy and an International Studies Ph.D. from The Fletcher School of Law and Diplomacy, Tufts University.

53.     **Defendant Hugo Verdegaal** is a Director of CorpBanca.  He became a Director on March 12, 2013.  Verdegaal previously served as Citigroup's and Citicorp's Latin America managing director in the investment banking and corporate finance divisions in New York.  He holds an M.A./B.A. in Economics degree from the Erasmus University (formerly Netherlands School of Economics) as well as an M.B.A. from the University of Michigan.  Verdegaal owns property in this District located on West 89th Street in Manhattan, and he has resided in both New York and New Jersey.

54.     **Defendant María Catalina Saieh Guzmán** is an Alternate Director of CorpBanca.  She became an Alternate Director on February 2, 2012.  Catalina Saieh Guzmán is the daughter of Saieh and sister of Defendant Jorge Andrés Saieh Guzmán.  She holds a B.A. in English and a M.A. in Literature from Pontificia Universidad Católica de Chile as well as an M.B.A. from the University of Chicago.   Ms. Saieh Guzmán appears to reside at the property

owned by her father, Saieh, in this District located on the corner of East 67th Street and 5th Avenue in Manhattan.

55.     **Defendant Ana Beatriz Holuigue Barros** is an Alternate Director of CorpBanca. She became an Alternate Director on August 30, 2011. Previously, Holuigue was a professor at the Universidad Católica de Chile. She received a B.A. in Business and Administration from the Universidad Católica de Chile.

**D.     Officer Defendants**

56.     **Defendant Fernando Massú Tare** is the Chief Executive Officer of CorpBanca. He became CEO on February 6, 2012.  Massú previously served as a Director and Second Vice Chairman of CorpBanca's board from October 15, 2009 until January 24, 2012.  Before that, Massú served as Group Corporate Director of Defendant CorpGroup.  Massú holds a B.A. in Business and Administration from Universidad Adolfo Ibañez and attended a Professional Management Course at Harvard University.  Massú reviewed and signed the material event notices filed with the Chilean Superintendent.

57.     **Defendant Eugenio Gigogne Miqueles** is the Chief Financial Officer of CorpBanca.  He has served as CFO since April 2010. Previously, he had served as head of CorpBanca's market risk department.  Mr. Gigogne holds a B.A. in Business and Economics from the Universidad de Chile and an M.B.A. from Tulane University.

## BACKGROUND

**A.     Saieh's Acquisition and Growth of CorpBanca**

58.     In 1996, Saieh purchased a majority interest in CorpBanca.  Over the next decade and a half, he built the Bank through acquisitions and organic growth into Chile's fourth-largest, non-state-owned bank.

59.     CorpBanca's public filings disclose that Saieh is a sophisticated financial player who has a long history at CorpBanca as its controlling shareholder.

60.     In CorpBanca's Form 20-F, the Bank describes Saieh as having 20 years of experience in directing "the acquisition, creation and operation of a number of commercial banks, mutual fund companies, insurance companies and other financial entities in Chile and other parts of Latin America" and "27 years of experience in the Chilean financial industry." Indeed, Saieh is well-known for his proclivity for financially engineering sophisticated and purposefully opaque transactions and special purpose investment vehicles ("SPV"). For example, Saieh engineered SPVs designed to channel money from CorpBanca to SMU. Because the money was funneled through the SPVs, it technically did not require disclosure as a related party transaction under Chile's then-applicable regulations. However, when an investigative reporter uncovered the link in July 2013, Chilean regulators plugged the loophole, and such SPVs must now be disclosed as related party transactions and count toward the Bank's related party lending limits.

61.     In mid-2012, CorpBanca entered a transaction to acquire Banco Santander Colombia, and then in 2013 it entered a transaction to acquire Helm Bank in Colombia and Panamá. Following these significant acquisitions, CorpBanca represented in its Form 20-F that it was shifting strategic gears to adjust from a period of external growth to focus on "organic growth."

62.     Defendants issued repeated assurances to the public, Chilean and U.S. government agencies, and investors, including Cartica, that the Bank was operating for the benefit of the owners of the Bank's common shares based on equal treatment of each share and was focusing on a strategy of "organic growth" of its banking operations.

**B.    Saieh's Failed Attempt to Grow SMU**

63.    In 2007, Saieh used CorpGroup to acquire SMU.  SMU had a strong appetite for acquisitions, taking over dozens of companies, acquisitions Saieh financed with debt.  Of late, SMU has been heavily scrutinized for its underperformance.

64.    According to news and analyst reports, SMU's acquisition appetite left it with more than 60 acquisitions in Chile and Peru and facing integration problems and, as of September 2013, a $1.3 billion debt load that analysts have described as heavy.

65.    In the first nine months of 2013, SMU's losses reached $720 million.  In August 2013, SMU disclosed accounting errors in a review of first-quarter earnings and was forced to increase its stated liabilities in a restatement.  This cascaded into SMU breaching certain of its debt covenants.

66.    In response, Saieh reshuffled SMU's Board of Directors, began selling assets, closing stores, and laying off 7,000 employees.  In fact, Saieh was forced to return to retake a position on SMU's board as Chairman.  To further prop up SMU, in October 2013, he injected $300 million into the supermarket chain, 60% of which was from him personally.

67.    Press reports in 2013 took note of SMU's financial problems and detailed how these problems were affecting Saieh's other holdings as well.  For example, on July 18, 2013 Bloomberg News reported that:

> [b]illionaire Alvaro Saieh's effort to repair his Chilean grocery chain's credit standing is tainting the bonds of his flagship banking group as speculation grows that he may turn to the financial arm to raise cash. . . .  Saieh's pledge of as much as $250 million toward [an SMU] rights offering prompted some investors to speculate that he may try to get the money by redeeming some of his investment in Corp Group, reducing its capital or taking out loans, according to Sartor Investments. . . .  Feller Rate Clasificadores de Riesgo Ltda, a Santiago-based credit rating agency, lowered its rating for SMU's local bonds to BB+ from BBB on July 12, citing 'the low availability by the controlling shareholder to deliver new capital due to the financing needs that the group must complete in other

areas,' according to an e-mailed statement. . . .  'All of Saieh's companies have the same circular logo, including SMU,' Sebastian Gazmuri, the head of investments at Santiago-based asset manager Sartor Investments, said in a phone interview.  'If they all look the same, when one of the companies is in trouble, the market will also think that the other ones are suffering.'

68.     SMU recently released its year-end results, disclosing that it had sustained losses in excess of $960 million for 2013.

## C.     Saieh's Use of CorpBanca

69.     Saieh has an infamous history of exploiting his CorpBanca holdings.  For example, in July 2013, an investigative journalist exposed several CorpGroup-related SPVs that Saieh had engineered to clandestinely funnel money from CorpBanca to SMU.

70.     When their SMU SPVs were exposed, regulators acted to implement regulations that made the Banks loans to such SPVs count as related party transactions, *i.e.*, transactions that must be reported the Chilean banking regulators as related party loans and included in the notes to any financial statements as related party transactions.

71.     Saieh and CorpGroup are also widely reported to have pledged a substantial portion of their CorpBanca shares to various financial institutions.  Given that both CorpGroup and CorpBanca have longstanding commercial relations with Itaú, such pledges could well have been made to Itaú.

72.     In addition, Saieh and CorpGroup are active and frequent traders.  To finance many of their trading and investment activities, they often employ repurchase transactions of their CorpBanca shares.

73.     Ultimately, in the face of serious financial troubles at CorpGroup, Saieh and CorpGroup built on their history of exploiting their CorpBanca holdings.   Via the Itaú Transaction, they focused on extracting the greatest value possible from their majority holding of

CorpBanca stock—a premium Saieh and CorpGroup could not achieve in a straightforward per share valuation of all CorpBanca shares assessed on an equal basis.

**D.     Saieh's Sale of CorpBanca**

74.     In order to reimburse himself for the vast sums he invested into SMU, and to secure additional personal benefits for himself, Saieh, along with the Defendants, began to look for and ultimately consummated a transaction in which Saieh sold control of CorpBanca. Numerous press reports in late 2013 and into January 2014 reported on this process and Saieh's personal motivations and state of mind.  For example:

75.     *November 2013*: Rumors of a CorpBanca transaction emerged, with common speculation being that Saieh was selling control of his "crown jewel"—CorpBanca—to obtain liquidity for SMU, an assertion Saieh denied.

76.     *November 28, 2013*: El Mostrador reported that CorpBanca was in talks with Brazilian bank Itaú, Chile's BCI, Canada's Bank of Nova Scotia ("Scotiabank") and Spain's BBVA for a merger.  CorpBanca's shares rose 8.5 percent on the news, and the SVS requested that CorpBanca issue a statement to explain if there was a reason for the share move.

77.     *November 29, 2013*: The Bank confirmed that it had retained "international investment banks" to help analyze "potential transactions" involving the Bank and "other national or international bank operators" in a disclosure (*hecho esencial* or material notice) submitted to the SVS and subsequently filed with the SEC.

78.     *December 4, 2013*: Reuters noted that the "timing of the deal surprised investors, who expected CorpBanca first to finish the integration of two banks it bought in Colombia before attempting a sale."  Reuters also noted that "[l]ocal media reports said that Saieh . . . is keen to remain as co-controller of the merged bank.  Saieh, who controls CorpBanca via the

wider CorpGroup, has been seeking to raise cash since an accounting error led his SMU retail company to breach debt covenants earlier this year."

79.   *December 6, 2013*:   Moody's cut CorpBanca's credit rating to Baa3 from Baa2, citing the problems at SMU and explaining that the troubles at SMU could impede CorpBanca's growth.

80.   *December 12, 2013*:   Reuters reported "Chilean bank CorpBanca confirmed it had received merger offers but said it would only accept a bid that allows billionaire businessman Saieh to retain some control in the bank."   That same day, the Bank reconfirmed its intention to seek a combination with a larger regional institution in a second disclosure (*hecho esencial* or material notice) filed with the SVS and SEC, and elaborated that it was working to identify "an appropriate counterparty . . . and to define a transaction structure."   The Bank also disclosed that "[i]f any such transaction is executed and consummated, the Saieh group is expected to maintain an equity participation and will be active in the management of the combined business."

81.   *December 18, 2013*:   the Wall Street Journal reported that BBVA and Itaú were in final talks for a 50.1% stake in CorpBanca, but that "current owners want to share control." "Current owners of CorpBanca would retain a 49.9% stake, and any deal would give them mechanisms to share control in the post-transaction bank, this person [cited] said, adding that the buyers want a 50.1% stake in CorpBanca for accounting and consolidation purposes."

82.   *December 19, 2013*:   Reuters noted that "[t]he bank . . . has said it would only accept a bid that allows Saieh to retain some control."   That day the Bank reconfirmed in a third disclosure (*hecho esencial* or material notice) filed with the SVS and SEC that it was continuing to work to identify "an appropriate counterparty . . . and to define a transaction structure."

83.   *December 20, 2013*:   El Mostrador reported that "Itaú offers better terms for co-

control, whereas the financial offer from BBVA is 'considerably' better." And El Mercurio reported that, "observers believe the deal [is] worth some US$5bil - US$6bil, but what is on the table now is the shareholders agreement, meaning the future role of Saieh."

84.    *December 22, 2014*:  Saieh told the Wall Street Journal that he "rejects the widely reported notion that he is pursuing the sale because he needs money for the supermarket chain." He stated that he "began exploring [the sale of CorpBanca] in early 2012."

85.    *December 24, 2013*:  El Mercurio noted "Saieh has already pumped US$300mil into SMU, his struggling supermarket enterprise . . . and has to come up with another US$200mil soon" to lighten the retailer's debt burden.  Saieh responds that "[a] sale to Spanish or Brazilian interests would not occur (or even serve) merely to bail out SMU [and] to have looked into the possibility in early 2012 before his problems in the supermarket sector became known."

86.    *January 29, 2014*:  CorpBanca announces that it reached an agreement whereby Itaú would merge its Chilean and Colombian units with CorpBanca.

87.    After announcement of the Itaú Transaction together with the disclosure of a mere summary of the deal's terms, CorpBanca's share price declined precipitously amid reports by local media and financial analysts that highlighted concerns for minority shareholders.

88.    Between November 29, 2013 (the day after CorpBanca announced that it had retained "international investment banks" to analyze a "possible transaction") and January 28, 2014 (the day before the announcement of the Itaú Transaction), CorpBanca ADRs traded at a Volume Weighted Average Price ("VWAP") of $20.04.  On January 29, 2014, the day of the announcement, the ADRs closed at $16.35, a drop of more than 18% from the VWAP.

## DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT

### A.     The Impetus for Saieh's Fraudulent Deal

89.     At the crux of this action are two significant companies in Saieh's empire: CorpBanca and SMU.  Over the past decade and a half, the former company prospered and garnered favorable investor attention.  In recent years, the latter company floundered financially and triggered unfavorable investor attention and impaired the financial health of CorpGroup.

90.     SMU's failures have hit both Saieh and CorpBanca hard.  Saieh recently had to put $300 million into SMU with plans to raise $200 million more while also paying down $130 million in SMU debt.  This $630 million effort to stabilize SMU is problematic even for a reported billionaire.  CorpBanca likewise was harmed by the severe problems at SMU.  In August, when SMU restated its financials to report a huge loss and a resulting breach of debt covenants, fears of contagion pushed shares of the Saieh-controlled CorpBanca to an all-time low.  In addition, CorpBanca disclosed that it "faced an increase in the cost of funding due to the situation of a related company, SMU."  Moody's Investors Services ultimately downgraded CorpBanca's debt in large part because it shared a controlling shareholder with SMU.

91.     Faced with these financial troubles, Saieh resorted to a scheme of fraudulent disclosures and manipulation of the markets for CorpBanca's securities—through what ultimately became the Itaú Transaction—in order to extract both short- and long-term value from minority shareholders to benefit himself and prop up his faltering empire.

### B.     Saieh's Orchestration of the Fraudulent Deal

92.     At the very time that Saieh had poured much of his personal wealth into SMU and was obligated to make additional capital injections into SMU, CorpBanca was suddenly and conveniently approached with offers for a number of opportunities to enter an "appropriate"

transaction to benefit all shareholders equally as required by law and publicly confirmed again and again in CorpBanca's securities filings and personally by Saieh to Cartica.

93.     The truth, however, is that Saieh plotted with the other Defendants to shop the Bank to extract value from CorpBanca in order to prop up his ailing financial empire.  While the act of selling a company in and of itself is not suspect, Defendants' execution of their planned sale was designed to manipulate the market through misleading communications and deceit.

94.     Saieh and the other Defendants knew that Chilean law mandated that all shares be treated equally.  In turn, they made repeated assurances and representations to the public, investors, and Chilean and U.S. government agencies that the Bank was operating for the benefit of all the owners of the Bank's common shares based on equal treatment of each share.  Likewise, Defendants disclosed that after significant acquisitions in 2012-2013, the Bank was focusing on a strategy of "organic growth" and the improvement of integration in its existing banking operations.  Later, following media reports that he was seeking a major transaction with a larger bank, Saieh personally acknowledged to Cartica that he and CorpBanca would seek only a transaction that complied with their legal obligations and disclosures and maximized value for *all shareholders* without seeking special benefits for himself.

95.     In reality, and undisclosed to minority shareholders, Defendants were doing just what Saieh promised they would not do.  Defendants were actively seeking opportunities to maximize the value of the shares owned by Saieh and CorpGroup at the expense of minority shareholders, including Cartica, in order to accomplish at least several things:  (i) refill Saieh's and CorpGroup's coffers that had been emptied propping up SMU, (ii) provide CorpGroup with desperately needed liquidity, (iii) save face for Saieh by avoiding a transaction that would be technically called a "sale," and (iv) secure jobs for Saieh's son and one of his faithful lieutenants.

At the same time, Saieh built several backdoors into the deal designed to ensure he benefited from the Itaú Transaction via put and call options designed to secure long-term, risk-free value for Saieh and CorpGroup.  Moreover, these backdoors are built into the deal at the cost of the Bank's long-term capital, which will be impaired for at least eight years if the Itaú Transaction is permitted to close.

96.     In November 2013, December 2013, and January 2014, Defendants filed certain single-paged, barebones disclosures regarding preliminary merger discussions with the SVS and SEC, but those statements disclosed next to nothing.  Nowhere did they disclose that Defendants were deviating from their publicly stated purpose of achieving equal treatment for all shareholders.  Nowhere did they disclose that the transaction would benefit Saieh specifically.

97.     In December, Saieh and the Bank made public statements that they would only accept a bid that allowed Saieh to retain some control.  Alarmed by such statements, Cartica initiated communications with Saieh directly.  On December 9, 2013, Cartica's Managing Director Teresa Barger met with Saieh in his New York apartment and office and explained to him that the goal of any CorpBanca transaction must be to secure the highest value for *all* shareholders.  Barger further explained that any transaction reflecting special benefits for Saieh that did not inure to all shareholders equally would unacceptably and unlawfully shift value from minority shareholders to Saieh.  On December 20, 2013, in a letter to Saieh, Barger reiterated the singular importance of securing the highest value for *all* shareholders.

98.     In response to these admonitions from Cartica, Saieh specifically affirmed to Cartica that he would *not* seek personal benefits but, consistent with CorpBanca's legal disclosures and legal obligations, he would seek a transaction and negotiate for the maximum benefit for all shareholders.  Based on these direct representations, Cartica decided to not only

maintain its large minority position in CorpBanca but to purchase additional CorpBanca securities. In December 2013 and early January 2014, Cartica purchased an additional 188 million CorpBanca shares while continuing to hold its CorpBanca ADRs.

**C.      Saieh's Piecemeal Disclosure of the Fraudulent Deal**

99.      On January 29, 2014, Defendants announced the Itaú Transaction in a curiously short disclosure and press release that was bereft of detail.

100.      In February 2014, still convinced that the CorpBanca Board of Directors was going to do the right thing, Cartica purchased an additional 2 billion CorpBanca shares.

101.      In the weeks following the Itaú Transaction announcement, however, the truth began to emerge. The day after the transaction announcement, Defendants provided limited disclosures about the transaction via a public call open to all investors.

102.      Plaintiffs learned later that Defendants had already made other disclosures via an early morning meeting with only certain chosen shareholders, but not Cartica—a practice that would be a violation of SEC Regulation FD if CorpBanca were a domestic issuer. News reports about the undisclosed investor call provided additional color on the true nature of the Itaú Transaction and suggested it was obtained via a manipulative scheme.

103.      On February 7, 2014, after Cartica pressed Saieh for more than a week for the specifics concerning the Itaú Transaction, Saieh directed Cartica to his attorneys. Saieh's attorneys then promptly informed Cartica that there would be no further disclosures concerning the Itaú Transaction until such disclosures were legally required.

**D.      Saieh's Fraudulent Deal**

104.      It was not until March 14, 2014, following significant shareholder outcry and media pressure, that Defendants disclosed on CorpBanca's website the actual Transaction

Agreement and Shareholders Agreement to which CorpBanca, Itaú, and CorpGroup are parties. Notably, Defendants refused to disclose (i) any of the Itaú Transaction's accompanying schedules, exhibits, or supporting valuations, or (ii) any of the clandestine side agreements tied to the Itaú Transactions, some of which Plaintiffs are only just now learning of a full two months after the Transaction's announcement.

105.    The Transaction Agreement and Shareholders Agreement confirm that Saieh and CorpGroup will receive an array of special benefits not shared with minority shareholders, including at least the following:

- The post-merger bank will purchase all CorpBanca Colombia shares held by CorpGroup for $329 million and CorpGroup's co-investors for an additional $565 million, purchase prices far in excess of fair market value;

- Itaú's subsidiary will extend a nearly $1 billion credit line to CorpGroup at a highly favorable interest rate;

- The post-merger bank will continue to contribute to Saieh's favored politicians;

- Itaú and CorpGroup carefully articulated a corporate governance regime that guarantees Itaú definitive control over the post-merger banks—which divests the post-merger bank's directors of their lawful role in running the public company and the minority shareholders of their franchise and governance rights; and

- CorpGroup also secured additional rights granted to no other shareholders, each of which represents a transfer of value from the Bank's shareholders to CorpGroup. These include:

  - appointment rights for two Director slots, which Saieh has stated will be filled by his son as Chairman and a faithful lieutenant, Massú, as a Director;

  - veto rights over certain actions by the post-merger bank;

  - tag-along rights, rights of first offer, and a share liquidity mechanism;

  - co-investment rights in any Itaú expansions into certain Latin American markets;

  - put rights ensuring CorpGroup's ability to cash out its ownership in the short term, but coupled with call rights that enable it to call back those same shares within five years not at the then prevailing market price at the time the call option is exercised but at the original put price (plus negligible interest);

- effective guaranteed minimum cash dividend rights over the next eight years that includes an unusual dividend put agreement; and

- share exchange rights enabling CorpGroup to trade its shares of the post-merger bank for direct shares of its parent company, Itaú.

### 1.   **The Fraudulent Deal's Cash Components**

106.   The Transaction Agreement and Shareholders Agreement together yield a transparent theme: ***Cash for CorpGroup***.  In the short term, CorpGroup secures cash via the sale of CorpBanca Colombia shares, which conveniently refills CorpGroup's coffers recently emptied in order to bail out SMU.  CorpGroup also obtains cash from a mandatory pre-merger sale of 1.3% of its shares.  In addition, CorpGroup secures much needed liquidity—*i.e.*, additional access to cash—via an enormous credit line, and that credit line can be drawn upon before the merger even closes.  And CorpGroup also obtains numerous rights granted to it, but not any other shareholders, through which CorpGroup can extract further cash from the post-merger bank, including tag-along, first offer, share liquidity, co-investment, share exchange, and put rights.

107.   The planned purchase of Saieh's interest in CorpBanca Colombia at an inflated price is quite troubling. For example, the Transaction Agreement reveals that no fairness opinion was delivered in connection with the acquisition of the unlisted Colombian assets.  The Transaction Agreement explicitly states that, even if the Colombian regulator demands an independent valuation, CorpGroup and Itaú have agreed to ignore such valuation in setting the exchange ratio for the merger of their Colombian operations.  This buyout of the CorpBanca Colombia shares is effectively a cash payout to Saieh that constitutes a transfer of value from the Bank's shareholders to CorpGroup and its co-investors in CorpBanca Colombia.

108.   The Transaction Agreement also provides for a previously undisclosed IPO of CorpBanca Colombia by the post-merger bank.  Defendants have identified certain deal

documents connected to the acquisition of CorpBanca Colombia that would shed light on the IPO, but have to date refused to disclose those documents. Given this imminent, post-merger IPO, there is no rational purpose for the post-merger bank to pay a non-market price for the interests of CorpGroup and the other minority shareholders prior to such IPO. The only explanation for purchasing a minority stake now, when the Bank already plans to go public, is to quickly transfer cash from CorpBanca's minority shareholders to Saieh.

## 2.   **The Fraudulent Deal's Put and Call Components**

109.    The Shareholders Agreement contains previously undisclosed provisions that enable CorpGroup to bleed CorpBanca of value not only in the short term but for at least the next eight years following the deal's closing. The 1/30/2014 Merger 6-K disclosed that the Shareholders Agreement granted CorpGroup the right to sell up to 6.6% of CorpBanca's shares to Itaú over the next five years. But that 6-K failed to disclose that CorpGroup will also be granted a "dividend put" to sell additional shares to Itaú in the event that dividends in any of the next eight years fall below $370 million. Interestingly, Saieh demands that dividends be calculated in U.S. dollars rather than in Chilean pesos, the currency under which the bank is run. In either scenario in which CorpGroup sells its shares to Itaú, it retains the right to buy back such shares not at the then prevailing market price (as CorpBanca previously indicated in its public filings) but at the *initial* sale price plus interest at a below market rate.

110.    These provisions give CorpGroup the ability to access immediate cash and simultaneously retain enormous potential upside with no corresponding downside risk. For example, CorpGroup could "sell" a large portion of its shares to Itaú at the then market price, and five years later it can repurchase those shares for that same price (plus below market interest) regardless of how much the shares have appreciated in price during that five-year period.

111.    The Shareholders Agreement also contains a previously undisclosed call option tied to CorpGroup's right to participate in certain future Itaú investments.  This deal provision has three elements.  First, CorpGroup has to approve any Itaú investment involving a capital increase or change in dividend policy.  Second, in the event CorpGroup approves such an investment, it also has the right to participate in the capital increase *and* Itaú is obligated to provide CorpGroup with long-term financing sufficient to fund CorpGroup's pro rata subscription.  Third, CorpGroup has an astoundingly favorable call right packaged into this provision that enables it to approve an Itaú investment, wait to invest in that new opportunity for up to a period of five years to determine if the investment becomes profitable, and then exercise its call rights at the original strike price.  In doing so, it would obtain its pro rata share not at the market price applicable when it exercises its call option, but at the original issuance price (plus negligible interest).

112.    CorpGroup's remarkably valuable put and call rights come at the expense of shareholders.  Itaú is a highly sophisticated and rational financial institution; it would never freely enter a transaction where it bears all the market risk and grants CorpGroup a five-year or eight-year, risk-free window within which to decide to buy back its shares at the initial sale price without Itaú receiving substantial compensation.  Of course CorpGroup's counterparty did no such thing.  Instead, it extracted a price for such risk shifting—namely an artificially deflated purchase price of a controlling stake in CorpBanca.

113.    Of critical importance here, the above put and call rights have exceptional but unquantifiable valuable—and are rights that are nowhere offered to shareholders other than Saieh.  They are part of the control share premium Saieh extracted from Itaú.

114.    The harm to shareholders is not limited to the deflated share price:  to secure Saieh's and CorpGroup's guaranteed dividend, Saieh has forced mandatory capital constraints on CorpBanca that will restrict the Bank's capital structure for at least the next eight years.  For example, rather than leave capital structure determinations to the Board and management so that they can assess the market in real time and optimally deploy capital, Saieh has ensured he will receive a continuous flow of cash through mandatory dividends that come at the expense of "achieving a growth rate of the [Bank's] total assets" as determined by the Board.  This mandatory and sub-optimal use of CorpBanca capital will irreparably sacrifice long-term value for both the post-merger bank and its shareholders in order secure cash for Saieh and will irreparably harm Cartica and other shareholders.

**E.**    **The Fraudulent Deal's Ultimate Impact**

115.    The Transaction Agreement and Shareholders Agreement ultimately confirm what the market merely suspected for over a month and half following the merger's announcement:  Saieh secured a deal that transferred to himself en masse value rightly belonging to all shareholders.

116.    The ultimate impact of the Itaú Transaction is unquantifiable.  For example, the long-term effect and corresponding value of the various put and call options Saieh built into the Itaú Transaction to benefit himself alone cannot be accurately measured; they are as yet unexercised free options that span five- and eight-year periods.  Nor can the impact of the capital structure restrictions Saieh built into the deal be calculated with any certainty when the effect of such capital strictures has yet to occur and will be borne out over the next eight years.

117.    Unquantifiable, however, does not mean insubstantial.  These are valuable rights. They are rights Saieh secured from a sophisticated counterparty.  They were not awarded to

Saieh for being a good citizen.  They came at a cost.  And that cost will be borne by CorpBanca's minority shareholders, including Cartica, who will be harmed by the special benefits Saieh has deceitfully carved out for himself.

118.   The Itaú Transaction also suffers from other failings.  It is an opaque transaction by design.  The reasons for this are many, but two are especially critical:  Saieh wanted to transfer control of CorpBanca but did not want to do so via an outright sale that would have prevented him from extracting a control share premium.  Itaú wanted control of CorpBanca but, as media reported, other banks were willing to pay more via an outright sale.  Itaú and Defendants structured the Itaú Transaction to resolve these two problems:  the deal gave Itaú control and Saieh his control share premium in the form of numerous side benefits.  Moreover, in connection with creating and entering the Itaú Transaction, Defendants made numerous misstatements and omissions described below.

119.   While the Itaú Transaction is labeled a merger, in reality it is a disguised sale of CorpBanca.  It is designed to provide special benefits to Saieh while permitting him to avoid a straightforward sale via a tender offer or similar mechanism that would value CorpBanca on an equal per share basis.  Saieh financially engineered a sale of CorpBanca that he could technically term a merger but at the same time would enable him to bleed the Bank of value in order to:  (i) prop up CorpGroup in the wake of its SMU-related failures, (ii) provide CorpGroup with desperately needed liquidity, (iii) save face by avoiding a "sale" of his crown jewel, (iv) secure jobs for his son and a faithful lieutenant.  Saieh also built put and call options into the Itaú Transaction that created unquantifiable but enormous upside for himself alone.  Then, to secure continual cash flow, Saieh placed long-term limits on CorpBanca's capital structure that subject the Bank to future, unquantifiable losses due to the Bank's inability to optimally structure and

deploy capital. Saieh carved out these many valuable benefits that inured to himself and no other

shareholders while, at the same time, repeatedly claiming the merger would benefit all

shareholders equally.

120.    Saieh's fraudulent scheme is bold and brazen. He says an unfair deal is a fair

deal. He says a sale is not a sale. He says the CorpGroup-rescue transaction was not a

transaction to rescue CorpGroup. But just saying something doesn't make it true.

121.    Cartica has and continues to be harmed by the fraudulently misleading disclosures

relating to the Itaú Transaction. Relying on public disclosures and direct representations from

Defendants, Cartica not only maintained its holdings but actually increased them. Defendants'

fraudulent representations in the pre-merger period effectively foreclosed Cartica from

knowledgably acting to alter the course of the merger discussions—through public pressure,

litigation or otherwise. That harm can be undone only through an injunction preventing the

merger. Even now, the continued failure to make full and fair disclosures deprives Cartica and

other shareholders of the ability to take knowledgeable and fully informed action with regards to

their CorpBanca securities.

122.    The Itaú Transaction is the product of Saieh's fraud. If it is permitted to close, the

minority shareholders will face not only a diminution in the value of their CorpBanca securities,

but they will suffer irreparable harm. They will face long-term restriction of the post-merger

bank's capital structure, and lost value from the long-term put and call options that Saieh carved

out for himself. Saieh and CorpGroup will win big, and the minority shareholders including

Cartica will suffer permanent, unquantifiable, and irreparable losses.

123.    Equity and the securities laws demand a different outcome. Cartica brings this

suit to enjoin Defendants from taking any further steps to close the Itaú Transaction and/or

secure any regulatory approval for the deal. Such relief is necessary to prevent long-term restrictions to CorpBanca's capital structure that will yield irreparable harm, avoid lost value from the long-term put and call options that Saieh carved out for himself, and prohibit Defendants from benefiting from the fruits of their deception. An injunction preventing the Itaú Transaction from closing would ameliorate the past and continuing harm experienced by Cartica, terminate the anticipated capital restrictions (and avoid resulting damages), nullify the benefits the deal will hand to Saieh, and transfer the value of those benefits back to all shareholders.

124. A preliminary injunction is warranted here. Absent a preliminary injunction temporarily halting the Itaú Transaction in order to preserve the status quo, the merger will continue to roll toward closing, at which point it will be nigh impossible to unwind the newly formed banking enterprise that will span multiple countries. Such continued progress in the Itaú Transaction will irreparably harm Cartica by moving it further and further from the true intrinsic value of each of its over 10 billion shares and step-by-step closer to permanently transferring that value into Saieh's pocket—essentially rewarding him with ill-gotten gains.

125. Ultimately, a permanent injunction is also warranted here. The Itaú Transaction is the product of Defendants' fraudulent actions and would, if permitted to close as currently structured, permanently and irreversibly harm Cartica by restricting CorpBanca's capital for at least the next eight years. Absent a permanent injunction enjoining the closing of the Itaú Transaction as-structured, minority shareholders including Cartica will be left as owners of a bank whose capital is artificially restricted, and they will be deprived permanently of the true value of their shares.

## FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS OF MATERIAL FACTS

126.    Cartica's and its counsel's investigation has revealed that Defendants' Form 6-K filings, certain public statements by Saieh and the Bank, and certain private statements by Saieh to Cartica contain numerous material misstatements and omissions.

**A.    Pre-Merger Disclosures**

127.    *November 29, 2013 Form 6-K*:  On November 29, 2013, CorpBanca filed a Form 6-K with the SEC ("11/29/13 6-K") to report that it had filed a material event notice ("11/29/13 Notice") with the SVS.  The 11/29/13 6-K, reviewed and signed by Defendant Massú, CorpBanca's CEO, attached and incorporated the 11/29/13 Notice, which was also reviewed and signed by Massú.  The 11/29/13 Notice stated:

> (a) CorpBanca is analyzing, with the help of international investment banks, potential transactions involving the bank, which could include, among other structures, a merger with other national or international bank operators. (b) The potential transaction is currently on the evaluation stage, with the bank having received non binding and preliminary expressions of interest from third parties. (c) As of the date hereof, neither a counterparty nor the structure for a potential transaction have been defined. The Company has not entered into any binding agreement with any third party concerning a potential transaction . . . .

128.    *December 12, 2013 Form 6-K*:  On December 12, 2013, CorpBanca filed a Form 6-K with the SEC ("12/12/13 6-K") to report that it had filed a material event notice ("12/12/13 Notice") with the Superintendent.  The 12/12/13 6-K, reviewed and signed by Defendant Gigogne, CorpBanca's CFO, attached and incorporated the 12/12/13 Notice, which was reviewed and signed by Defendant Massú, CorpBanca's CEO.  The 12/12/13 Notice stated:

> CorpBanca has received offerings for a possible merger of its business in Chile and abroad from prestigious and well known banks. CorpBanca is presently evaluating these offers with the assistance of international investment banks to identify an appropriate counterparty to such transaction and to define a transaction structure.  As of the date hereof, CorpBanca has not entered into a binding agreement with any third parties concerning a possible transaction (other than

confidentiality agreements). If any such transaction is executed and consummated, the Saieh group is expected to maintain an equity participation and will be active in the management of the combined business. CorpBanca will keep your Superintendency, the banks regulator and the market duly informed of any relevant event in this regard.

129. *December 19, 2013 Form 6-K*: On December 19, 2013, CorpBanca filed a Form 6-K with the SEC ("12/19/13 6-K") to report that it had filed a material event notice ("12/19/13 Notice") with the Superintendent. The 12/19/13 6-K, reviewed and signed by Defendant Gigogne, CorpBanca's CFO, attached and incorporated the 12/19/13 Notice, which was reviewed and signed by Defendant Palacios, CorpBanca's CEO at that time. The 12/19/13 Notice stated:

> In light of the information published today in several specialized media, CorpBanca hereby confirms that it continues to analyzing {sic} transaction offers with the assistance of international investment banks to determine an appropriate counterparty and a transaction structure. Additionally, CorpBanca confirms that it has not entered into any binding agreement, preliminary or definitive, with any third party concerning a potential transaction . . . . CorpBanca will keep your Superintendency, the banks regulator and the market duly informed of any relevant in this regard.

130. *January 22, 2014 Form 6-K*: On January 22, 2014, CorpBanca filed a Form 6-K with the SEC ("1/22/14 6-K") to report that it had filed a material event notice ("1/20/14 Notice") with the Superintendent. The 1/22/14 6-K, reviewed and signed by Defendant Gigogne, CorpBanca's CFO, attached and incorporated the 1/20/14 Notice, which was reviewed and signed by Defendant Massú, CorpBanca's CEO. The 1/20/14 Notice stated:

> On the date hereof, the Colombian Superintendency of Finance has required our subsidiary, Banco CorpBanca Colombia S.A., to inform you regarding "*the actions and negotiations of its controlling shareholders and any other information that should be known by to {sic} market, regarding the alternatives for the consolidation of its business in Chile and abroad with other banking operators.*" In connection with the request of information by the Colombian Superintendency of Finance, CorpBanca has informed its subsidiary Banco Corpbanca Colombia S.A. that it has taken actions and negotiations have occurred but that no binding agreement has been reached, preliminary or definitive . . . . CorpBanca will keep

your Superintendency, the banks regulator and the market duly informed of any relevant event in this regard.

131.    *Reasons Why the 11/29/13 6-K, 12/12/13 6-K, and 12/19/13 6-K Are Materially False and Misleading*: The 11/29/13 6-K disclosed that Defendants were "analyzing . . . potential transactions" after "having received . . . preliminary expressions of interest." The 12/12/13 6-K disclosed that Defendants "had received offerings for a possible merger" and that CorpBanca was "evaluating these offers . . . to identify an appropriate counterparty to such transaction and to define a transaction structure." And the 12/19/13 6-K disclosed once again that Defendants were attempting to identify an "appropriate counterparty . . . and define a transaction structure." However, the 6-Ks did not disclose that Defendants were in fact shopping Saieh's controlling block of shares and actively soliciting such a transaction. While the 6-K disclosures stated that the Bank had merely received offers for a merger, Saieh's public statements told a different story: Saieh told the Wall Street Journal on December 22, 2013 that he had originated the idea for a sale and that he had done so as far back as 2012.

132.    Moreover, the 6-Ks failed to disclose that Defendants were "evaluating" the offers Defendants solicited not to "identify an appropriate counterparty . . . [or] transaction structure" equally beneficial to all shareholders, but a counterparty and transaction structure "appropriate" for Saieh to extract a control share premium for himself. Furthermore, Defendants failed to disclose that the Saieh-specific benefits they were negotiating for would be obtained at the expense of minority shareholders. As detailed in ¶¶ 187–208, these are facts of which Defendants were aware or recklessly disregarded at the time each of the 6-Ks was filed. By reason of these omissions, Defendants' 11/29/13 6-K, 12/12/13 6-K, and 12/19/13 6-K filings are materially misleading.

133.    *Reasons Why the 1/22/14 6-K Is Materially False and Misleading*:  The 1/22/14 6-K was especially egregious in that, despite promising in its 12/12/13 6-K and again in its 12/19/13 6-K to "keep [the Chilean Superintendent], the banks {sic} regulator and the market duly informed of any relevant event," CorpBanca had to be instructed by the Colombian Superintendent to provide an update on material events effecting the future of the Bank, including "any other information that should be known by the market."  In response, Defendants disclosed merely that it "has taken actions and negotiations have occurred."  However, the 1/22/14 6-K disclosed not a single word that Defendants were days away from signing the Transaction Agreement, memorializing a deal designed not to maximize value for all shareholders but to bestow significant, extraordinarily valuable short- and long-term benefits on Saieh at the expense of minority shareholders.  As detailed in ¶¶ 187–208, these are facts of which Defendants were aware or recklessly disregarded at the time 1/22/14 6-K was filed.  By reason of these omissions, Defendants' 1/22/14 6-K filing is materially misleading.

## B.    Pre-Merger Statements

134.    *December 11, 2013  Public Statement by Saieh*: On December 11, 2013, in an email to Bloomberg News and in relation to a possible sale of his stake in CorpBanca, Saieh stated that: "None of the resources received [from the CorpBanca transaction] will go to SMU."

135.    *Reasons Why Saieh's 12/11/13 Public Statement Is Materially False and Misleading*:  Saieh's 12/11/13 statement was false and misleading because Saieh was actively shopping his interests in CorpBanca to raise money and liquidity *for* SMU while stating no proceeds from a sale would be used for SMU.  Indeed, the 1/29/14 Merger Notice states that an Itaú subsidiary had granted CorpGroup a credit line of up to $950 million and that this side agreement was designed to "facilitate the closure of the transaction" between CorpBanca and

Itaú.  In contrast to Saieh's public statement, Saieh was compelled to shore up CorpGroup's

liquidity due to massive cash infusions into SMU, so Saieh actively shopped his interests in

CorpBanca.  Saieh was able to obtain a highly beneficial side agreement that shored up liquidity

in SMU's parent entity to the detriment of CorpBanca's minority shareholders.  CorpBanca's

minority shareholders, in turn, made investment decisions based on Saieh's false assurances to

the contrary.

136.    *Saieh's Private Statements*:  In December 2013, Cartica's Managing Director

Teresa Barger met with Saieh at his New York apartment.  At that meeting, Saieh communicated

to Cartica that he and the Bank were seeking a transaction that provided the maximum benefit to

*all* shareholders and would not seek any special treatment for himself.

137.    *Reasons Why Saieh's Private Statements Are Materially False and Misleading*:

Saieh's private assurances to Cartica—during a face-to-face meeting—were false and

misleading.  One need only look at the many side benefits Saieh carved out for himself via the

Itaú Transaction in order to determine he lied to Cartica.

## C.    Post-Merger Disclosures

138.    *January 30, 2014 Form 6-K*:  On January 30, 2014, CorpBanca filed a Form 6-K

with the SEC ("1/30/14 Merger 6-K") to report that it had filed a material event notice ("1/29/14

Notice") with the Superintendent.  The 1/30/14 Merger 6-K, reviewed and signed by Defendant

Gigogne, CorpBanca's CFO, attached and incorporated the 1/29/14 Merger Notice, which was

reviewed and signed by Defendant Massú, CorpBanca's CEO.  The 1/29/14 Merger Notice

stated in relevant part:

> As of the date hereof, Corpbanca executed with Inversiones Corp Group Interhold
> Limitada, Inversiones Saga Limitada (together with Corp Group Interhold
> Limitada, "CorpGroup") Itaú-Unibanco Holding, S.A. ("Itaú-Unibanco") and
> Banco Itaú Chile, an English-language contract entitled "Transaction Agreement"

by virtue of which said parties have agreed on a strategic alliance of their operations in Chile and Colombia subject to the receipt of prior approval of the pertinent regulatory authorities and from the shareholders of Corpbanca and Banco Itaú Chile, as detailed below.

\*   \*   \*

Even though it is not part of the corporate approval granted by the Board to the Transaction Agreement, both the Committee of Directors and the Board are aware of the financing agreement by and between Banco Itaú BBA, Nassau Branch and CorpGroup pursuant to which CorpGroup will be granted a credit line of up to US$950 million for a seven year term at market interest rate and guaranteed by the pledge of its shares in Corpbanca and other collateral. The credit line could be drawn by tranches, being the first of them payable on September 30th, 2014. The referred agreement seeks to facilitate the closure of the transaction giving the option to CorpGroup to refinance financial obligations subject to covenants.

139.   *January 30, 2014 Form 6-K*:  On January 30, 2014, CorpBanca filed a Form 6-K

with the SEC ("1/30/14 Press Release 6-K") to report that it had released a press release

announcing the merger ("1/29/14 Press Release") with the Superintendent.  The 1/30/14 Press

Release 6-K, reviewed and signed by Defendant Gigogne, CorpBanca's CFO, attached and

incorporated the 1/29/14 Press Release, which listed Defendant Gigogne as the contact person

for further information.  The 1/29/14 Press Release stated in relevant part:

> **CORPBANCA (NYSE:BCA; BCS: CORPBANCA)**, CorpGroup (CorpBanca's holding company) and Itaú Unibanco announce that today they have entered into a definitive agreement to merge CorpBanca and Banco Itaú Chile in a stock-for-stock transaction. . . . Following the closing of the transaction, Itaú Unibanco will be the controlling shareholder of the new merged Chilean Bank with a 33.58% ownership interest. Additionally, at closing, Itaú Unibanco and CorpGroup will sign a shareholders' agreement to determine aspects related to corporate governance, transfer of shares and liquidity among others. The new Chilean Bank will control CorpBanca's and Itaú Unibanco's Colombian subsidiaries.
>
> \*   \*   \*
>
> Key corporate governance terms to be included in the shareholders' agreement are related to the Board of Directors and senior management teams. The Board of Directors of the new Chilean Bank will be comprised of 11 directors and 2 alternate directors, while the Board of Directors of the Colombian bank will be comprised of 9 directors. CorpGroup will be entitled to appoint the Chairman of the Board of directors. CorpGroup expects to

appoint Mr. Jorge Andrés Saieh to serve as Chairman of the new Board of Directors in Chile as of the closing.

140.   *January 30, 2014 Public Statement by Jorge Andrés Saieh*: On January 30, 2014, on a public call convened by CorpBanca to discuss the Itaú Transaction with investors, Jorge Andrés Saieh stated repeatedly that the deal CorpBanca had entered with Itaú benefited all shareholders equally.

141.   *March 4, 2014 Public Letter from CorpGroup (and Saieh) Responding to Cartica*: On March 4, 2014, CorpGroup issued a public letter responding to questions raised by Cartica ("3/4/14 Letter"). The 3/4/14 Letter reiterated Saieh's and CorpGroup's previous statements that the Itaú Transaction benefited all shareholders equally.

142.   *March 12, 2014 Merger Q&A*: On March 12, 2014, CorpBanca published a series of "Questions & Answers with Respect to the Proposed Transaction" ("3/12/14 Merger Q&A"). The 3/12/14 Merger Q&A selectively identifies certain—but not all—benefits to Saieh:

14. What are the key terms of the shareholders' agreement to be signed between CorpGroup and Itaú?

\*   \*   \*

Liquidity Mechanisms: Itaú requested that CorpGroup indefinitely refrain from selling approximately half of its stake in the open market. Given this significant sale restriction, which no other minority shareholder is undertaking, CorpGroup may put shares to Itaú in certain circumstances. In other words, **CorpGroup's liquidity mechanisms compensate for the fact that, unlike minority shareholders, it has restrictions to sell shares in the open market (in addition to other covenants, such as non-compete restrictions and a pledge over a portion of its shares)**. The price applicable to such mechanisms will always be set at market value without premiums or privileges, using as first benchmark, the Santiago Stock Exchange. [emphasis added]

\*   \*   \*

17. The *Hecho Esencial* of January 29, 2014 also mentioned that CorpGroup obtained a credit line from Itaú. What is the rationale behind this?

The facility made available by Itaú to CorpGroup will be used to avoid potential obstacles to completion of the transaction and thereby enhances the certainty of closing, which is in the best interests of all of CorpBanca's shareholders. Certain holders of

CorpGroup's existing indebtedness currently have change of control or security interests that, unless waived, could hinder closing of the transaction. Therefore, to avoid subjecting the transaction to the need for third party creditor consents, any non-consenting debt must be refinanced. The loan has customary terms and conditions, was negotiated and executed on an arm's length basis, requires that CorpGroup post collateral and may be used by CorpGroup only to refinance its existing indebtedness.

143.   *Reasons Why 1/30/14 Merger 6-K, 1/30/14 Press Release 6-K, Jorge Andrés Saieh's 1/30/14 Public Statements, and 3/12/14 Merger Q&A Are Materially False and Misleading*: The documents filed by CorpBanca on 1/30/14 and 3/12/14, as well as the public statements on 1/30/14 did disclose certain aspects of the merger and a few of the benefits to Saieh. However, these filings and public statements suffered from numerous misstatements and omissions that made them false and misleading.

144.   The 1/30/14 Press Release 6-K called the Itaú Transaction a "stock-for-stock transaction." This of course is a blatant misstatement. Although there will be an exchange of stock, that is only one piece of the much larger transaction. The Transaction Agreement and the Shareholders Agreement make clear that the Itaú Transaction comprises much more than a straightforward share-for-share exchange. It is a share-for-share exchange, *plus* a below-market-rate loan of almost one billion dollars, *plus* a grant of call options that bear no downside risk, *plus* a right to share in future business opportunities, *plus* the effective guarantee of future dividends at the expense of the post-merger bank's growth, *plus* a cash payout for CorpBanca Colombia shares, *plus* additional benefits for Saieh. Each of these "pluses" accrues singularly to Saieh and to no other shareholders. These many side benefits, which are critical components of the Itaú Transaction, put the lie to Defendants' statements. Defendants' assertion that this is a mere "share-for-share" exchange that "treats all shareholders equally" is false.

145.   The filings and public statements mention the credit line provided to Saieh and state that it was provided at a market rate. Nowhere do those filings or statements disclose that

the credit line was not merely designed to "facilitate the closure of the transaction," it was in fact

an integral part of Saieh's plan to convert his controlling interest in CorpBanca and value from

the shares of minority shareholders into liquidity he needed to replenish the cash infusions he

made into SMU. The 1/29/14 Merger Notice falsely states that this side agreement was "not part

of the corporate approval granted by the Board to the Transaction Agreement," while noting that

"the Board are aware of the financing agreement." In truth, this agreement was integral to the

Itaú Transaction and conferred special benefits to Saieh to the detriment of other shareholders in

CorpBanca.

146.    The 3/12/14 Merger Q&A also states that credit line agreement "has customary

terms and conditions [and] was negotiated and executed on an arm's length basis." This is false.

A customary term would require CorpGroup to pay an interest rate equal to the actual rate it

must pay for money in the market. Instead, media reports that the rate will be equivalent to the

best available rate in Chile as of the date of drawdown.

147.    In addition to not disclosing the true motivation for the merger, self-serving side

agreements, and the transfer of significant benefits to Saieh and entities he controls, the 1/30/14

Merger 6-K, 1/29/14 Merger Notice, 1/30/14 Public Statements, and 3/12/14 Merger Q&A did

not disclose that CorpGroup would receive an option to co-invest with Itaú in a regional alliance

of banking businesses in Latin American markets or that the Transaction Agreement and

Shareholders' Agreement effectively value Saieh's CorpBanca shares at a higher value than

other shares.

148.    Furthermore, the 3/12/14 Merger Q&A expressly acknowledges that Saieh will

secure benefits from the Itaú Transaction that minority shareholders will not: "CorpGroup's

liquidity mechanisms *compensate* for the fact that, *unlike minority shareholders*, it has

restrictions to sell shares in the open market (in addition to other covenants, such as non-compete restrictions and a pledge over a portion of its shares)." To the extent there is a cost here, it is one of Saieh's own making, as Saieh chose to obtain a majority of CorpBanca shares and agreed to a future restriction on the sale those shares. Now, Saieh and the other Defendants have admitted that the share liquidity mechanism was built in to compensate Saieh and not minority shareholders. This directly contradicts Saieh's, Jorge Andrés Saieh's, and CorpBanca's statements—made in the 1/30/14 Merger 6-K, the 1/30/14 Press Release 6-K, the 1/30/14 Public Statements, and the 3/4/14 Letter—that the Itaú Transaction benefits all shareholders equally. Extra compensation for a controlling shareholder does not benefit all shareholders equally, and stating otherwise does not transform Defendants' lie into the truth.

149. Moreover, the Shareholders Agreement puts the lie to CorpGroup's disingenuous claim in the 3/12/14 Merger Q&A that "it has restrictions to sell shares" for which it must be "compensated." In fact, CorpGroup faces no barrier to selling all of its shares in the post-merger bank. For example, it will have the immediate right to sell half of its 32% holding in the post-merger bank. And it subsequently will have the right to put its remaining block of shares to Itaú at market price, a right that is far from a detriment to CorpGroup as it enables CorpGroup to unload a massive number of CorpBanca shares without incurring a market-moving discount. In light of CorpGroup's contractual right and ability to sell all of its shares in the post-merger bank, its statement in the 3/12/14 Merger Q&A that suggests the contrary is plainly deceptive and misleading.

150. In addition, the 3/12/14 Merger Q&A further purports to provide the "rationale" for nearly one billion dollar credit line that will issue to CorpGroup, explaining that "[t]he facility made available by Itaú to CorpGroup will be used to avoid potential obstacles to

completion of the transaction." Assuming a billion dollar credit line is essential to completing the Itaú Transaction, it is a cost that must be borne by Saieh, as it is a cost that he himself has created by (i) choosing to own a majority of CorpBanca shares, and (ii) making financial missteps through his other CorpGroup holdings. CorpBanca's justification of the credit line has no basis in fact. It is also contradicted by Defendants' own statements: on the one hand, Saieh has publicly stated that the credit facility is not a part of the Itaú Transaction and that it would not be drawn-down; on the other hand, Defendants' disclose that the credit facility was expressly acknowledged by CorpBanca's Director Committee as a related party transaction, and they also assert it is a facility that is necessary "to avoid potential obstacles to [the] completion of the transaction." Defendants cannot have it both ways.

151.    The 3/12/14 Merger Q&A also is misleading and inaccurate in its characterization of the credit facility as an arm's length transaction negotiated at market rates. In fact, Defendants' recent disclosure of the credit facility's financing terms tells a very different story. CorpGroup's bonds currently trade at a floating rate equivalent of LIBOR plus 500. The credit facility, in contrast, has been priced at LIBOR plus 270, which reflects a discount of nearly half the spread. This favorable discount reflected in this related party transaction is the opposite of an arm's length transaction negotiated at market rates.

152.    Furthermore, CorpBanca's Material Notice that was filed in Spanish with the SVS differed materially from the English translation of the document filed with the SEC. The original disclosure noted that CorpGroup's shares of the Bank would be reduced in the Itaú Transaction. The translated disclosure, in contrast, stated that CorpGroup's reduction in shares would occur via a sale to Itaú. If true, this would directly contradict Saieh's public statement that CorpGroup would receive no cash from the sale. When CorpBanca was asked about this discrepancy on an

49

investor call on March 5, 2014, Defendant Massú dismissively stated that the translated disclosure must be wrong. On March 12, 2014, CorpBanca filed a corrective disclosure with the SEC that removed the reference to "Itaú" and simply stated that there would be a cash sale by CorpGroup of a number of its CorpBanca shares in advance of the merger's closing. As of the date of this filing, CorpBanca has made no disclosure of these conflicting filings with the SVS.

153.     As detailed in ¶¶ 187–208, these are facts of which Defendants were aware or recklessly disregarded at the time each of the 6-Ks was filed. By reason of the above omissions and misstatements, Defendants' 1/30/14 Merger 6-K filings, 1/30/14 Press Release 6-K filings, 1/30/14 Public Statements, and 3/12/14 Merger Q&A filings are materially misleading.

154.     *Additional Reasons Why Jorge Andrés Saieh's 1/30/14 Public Statements Are Materially False and Misleading*: Jorge Andrés Saieh's 1/30/14 statements on the public teleconference convened by CorpBanca to discuss the Itaú Transaction with investors are additionally false and misleading, because they omitted key material discussions and deal terms that CorpBanca, via Jorge Andrés Saieh, had disclosed at an early morning meeting on January 30, 2014 to certain chosen investors but not all investors. The clandestine and selective nature of the 1/30/14 meeting strongly suggests that Defendants disclosed certain deal terms and other material, non-public information to the select group of investors in attendance at that early morning meeting but not to the other investors addressed on the public investor call held later that day.

155.     At the time Jorge Andrés Saieh made the public statements described above, he was speaking for CorpBanca and Defendants were aware or recklessly disregarded that his statements were false and at the time of they were made. By reason of the above omissions and misstatements, Jorge Andrés Saieh's 1/30/14 Public Statements are materially misleading.

## SCIENTER

156.    Defendants knew that the public documents and public and private statements, issued or disseminated by or in the name of the Bank, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding the Bank and its business practices, their control over and/or their associations with the Bank which made them privy to confidential proprietary information concerning the Bank, were active and culpable participants in the fraudulent scheme alleged and described above.

157.    Saieh and CorpGroup exercise control over CorpBanca.  As CorpBanca's own Form 20-F states, "Saieh Bendeck holds shares with sufficient voting power under Chilean law to approve substantially all of the forms of corporate action . . . including . . . to elect a majority of the nine members of our Board of Directors [and] direct our management."  It further states that Saieh, through CorpGroup, plays "an important role in guiding [CorpBanca's] growth, and steers the Bank "on matters concerning strategic development, control, and new business."

158.    The fraudulent scheme at issue in this case was just such a matter of strategic development and control—albeit one that was fraudulently crafted to benefit not the holders of CorpBanca shares and related securities, but one designed to exploit a control share in order to prop up Saieh's sagging financial empire.  Saieh was the orchestrator of the fraud and he and other Defendants willingly and actively participated in the fraudulent scheme and brought it to fruition.  Indeed, Saieh publicly commented on and held himself out as originating and directing

what eventually became the Itaú Transaction. In addition, when Cartica wrote to the CorpBanca Board of Directors to protest the terms of the Itaú Transaction and highlight how it impermissibly enriched Saieh, the Board of Directors did not respond to Cartica. Instead, *CorpGroup* issued a public response to Cartica's letter sent to the *CorpBanca Board*—plainly highlighting the fact that CorpGroup runs CorpBanca.

159.    Furthermore, despite knowing that the Bank had professed to have a legal duty to treat all shareholders equally, and despite affirming to Cartica that he understood the obligation to treat all shareholders equally and would do so, Saieh led the Bank to negotiate a transaction that would result in special benefits for himself at the expense of the shareholders who had bought or held stock in reliance on his statements and the statements the Bank he controlled had made and affirmed in numerous public filings. Despite this knowledge, he failed to instruct that full disclosure be made in the Bank's securities filings and instead knew or was reckless in not knowing that the scant statements filed with the SVS and SEC were inherently misleading by virtue of their lack of candor about the material nature of Saieh's shopping of the Bank in search of personal enrichment.

160.    While Saieh was the motivating force behind the fraudulent scheme, many of the material misstatements giving rise to liability were made by the Officer Defendants Massú and Gigogne in CorpBanca's public filings.

161.    On information and belief, Massú and Gigogne, as CEO and CFO, respectively, were intimately involved in the fundamental corporate change crafted by Saieh and were aware that the Bank was being actively shopped around and seeking out opportunities for a very specific transaction, one that would disproportionately benefit CorpBanca's controlling shareholder: Saieh.

162.    Upon information and belief, Massú and Gigogne were each aware of the public statements being made by Saieh and were aware that, as the Bank's controlling shareholder, he was holding himself out as representing the Bank and was perceived, at the very least, as an insider with intimate knowledge of the merger.  Nevertheless, neither Massú nor Gigogne filed or caused to be filed any material notices with the SVS or similar disclosures with the SEC that corrected Saieh's statements or disclosed that he was negotiating for and ultimately entering a transaction that would extract a control share premium at the expense of shareholders.  Instead, Massú and Gigogne signed the Bank's SVS and SEC filings recklessly or with knowledge that the statements were false or materially misleading, creating an impression among shareholders that the Bank had passively received expressions of interest in a merger and that it would evaluate them in the interests of all Bank shareholders.

163.    The Director Defendants likewise, due to their control-person positions at CorpBanca, had "the right to be fully informed, with complete documentation and at any time . . . with respect to the corporation's operation."  Chilean Corporations Law, Title IV, Article 39 (Ley 18046).  Because the Director Defendants had a legal obligation to exercise due care, they either knew or should have known about the fraudulent and misleading nature of the statements made by Saieh and the Bank.

164.    There is also substantial evidence, both direct and circumstantial, supporting a strong inference that Defendants acted with scienter.

165.    *Timing provides evidence.*  In 2013, Saieh's privately held corporate investment, SMU, imploded and required an injection of hundreds of millions of dollars from Saieh.  This created a liquidity crisis for Saieh.  At the same time, his empire also experienced related defaults on SMU bonds and downgrades on CorpBanca bonds.  This in turn raised the cost of

capital for Saieh (and CorpGroup), which compounded his liquidity issues. Following on the heels of these events, Saieh initiated a sale of his publicly traded bank that (conveniently, if consummated) provides him with a massive injection of capital, a huge amount of liquidity, and significant long-term sources of income.

166.    *Saieh's public statements provide evidence.*  Saieh adamantly (and deceitfully) denied any link between the SMU capital problems and the Itaú Transaction. He even went so far as to say that no proceeds from the Itaú Transaction would go to SMU. This is false and misleading. Saieh has recently injected hundreds of millions of dollars into SMU and through the Itaú Transaction he is replacing that money.

167.    *CorpBanca's public filings provide evidence.*  Throughout the process of securing the Itaú Transaction, CorpBanca made only four SVS and SEC filings regarding the deal. At least three of them were made after the SVS demanded that Defendants provide an update to investors. Even then, the disclosures say next to nothing.

168.    The first disclosure was in November 2013. It was filed only after market rumors of a transaction emerged and the Chilean securities regulator instructed CorpBanca to update the investing public. Defendants' resulting disclosure was short and vague; it announced only that CorpBanca had received several acquisition offers, which Defendants were evaluating in order to determine an "appropriate counterparty . . . and transaction structure." This disclosure contrasts sharply with Saieh's public statement to the Wall Street Journal, where he said he began exploring the transaction in early 2012, before SMU got into trouble, and noted that "CorpGroup won't receive any cash in the all-stock deal." If Saieh's public statement to the Wall Street Journal is to be credited, this directly contradicts CorpBanca's disclosure in its Form 20-F that it was shifting its strategy to focus on "organic growth." The stories simply do not line up.

169.    Saieh's conflicting tales are the product of calculated deceit by Defendants to ensure investors did not make a "run on the bank" by dumping shares that Saieh was about to devalue before he had a chance to strike his deal with Itaú.  The plan worked.  The limited information on the deal and the expectation that it would benefit all shareholders slowly pushed the stock price upwards throughout the final months of 2013.  Over the course of November and December, CorpBanca stock surged by 24.1% as excited investors bought in.  Of course, when Defendants finally disclosed limited details about the deal on January 28, 2014, the ADR price dropped significantly, losing 19.4% of its value from the previous day's high.  The market realized that minority shareholders had been greatly harmed.

170.    *The selective dissemination of deal specifics provides evidence.*  While Defendants were consciously and deliberately filing materially incomplete and therefore misleading disclosures about the merger, they were at the same time making more detailed presentations to certain hand-picked shareholders.  This sort of preferential disclosure was barred by the Dodd-Frank Act in 2010 for domestic issuers in the United States and the resulting SEC Regulation FD (Full Disclosure).

171.    *The delayed release of (still incomplete) transaction documents provides evidence.*  Although Defendants had discussed deal specifics with a select group of shareholders in a meeting on the day after the deal was announced, they refused to release the transaction documents to other investors or the public.  Defendants waited for more than a month following the announcement of the Itaú Transaction to publish the deal documents. On March 14, 2014 Defendants—cowed by public outcry—disclosed the transaction and shareholders agreements. Notably, Defendants failed to disclose (i) any of the Itaú Transaction's accompanying schedules, exhibits, or supporting valuations, or (ii) any of the clandestine side agreements tied to the Itaú

Transactions, some of which Plaintiffs are only just now hearing of a full two months after the Transaction's announcement.  There is no legitimate basis for depriving minority shareholders and the investing public of the critical and price moving terms of the deal and any related agreements.  Defendants were merely gaming the market by staving off disclosure of all the many side benefits to Saieh, a move calculated to hide Defendants' bad acts and conceal the nature of Defendants' many misstatements and omissions

172.   *The put and call options provide evidence*.  The put and call mechanisms incorporated into the Itaú Transaction are quite complex.  As described above, they enable Saieh to secure a potential for a huge payout over the next five- and eight-year periods with no risk.  These material financial provisions are plainly the product of deliberate and careful drafting and negotiation.  Given the detailed nature of these provisions, the corresponding lack of disclosure regarding the clauses and their long-term impact on the bank evidences Defendants' intent to defraud.

173.   *The share-for-share exchange mantra provides evidence*.  Defendants repeatedly invoke the "share-for-share" exchange mantra.  They do so for a very specific reason: it is an effort to justify Defendants' repeated misrepresentation that the Itaú Transaction benefits all shareholders equally.  But the Itaú Transaction does not benefit shareholders equally.  Nor is the Itaú Transaction comprised of a straightforward share-for-share exchange.  All of the provisions of both the Transaction Agreement and the Shareholders Agreement are essential elements of a single transaction.  Accordingly, Defendants knew they had to disclose both documents together to reflect the transaction.  It is not a mere share-for-share exchange.  It is a share-for-share exchange, *plus* a below-market-rate loan of almost one billion dollars, *plus* a grant of call options that bear no downside risk, *plus* a right to share in future business opportunities, *plus* the

effective guarantee of future dividends at the expense of the post-merger bank's growth, *plus* a

cash payout for CorpBanca Colombia shares, *plus* additional benefits to Saieh.  Each of these

"pluses" accrues singularly to Saieh and to no other shareholders. These many side benefits,

which are critical components of the Itaú Transaction, put the lie to Defendants' statements.

Defendants' knowledge of the many prongs of the Itaú Transactions is directly opposite their oft-

invoked mantras that the Itaú Transaction is a mere "share-for-share" exchange and one that

"treats all shareholders equally."  As such, this plain, calculated deceit evidences their intent to

defraud.

### SAIEH AND CORPGROUP AGREE WITH ITAÚ TO HOLD AND VOTE CORPBANCA SHARES TO EFFECT A CHANGE IN CONTROL—BUT FAIL TO MAKE ANY ACCOMPANYING DISCLOSURES

174.    Section 13(d) of the Exchange Act requires any person that holds beneficial

ownership of more than 5% of a class of shares of a company registered under Section 12 of the

Exchange Act to file full and complete disclosures on a report on Schedule 13D.  The Schedule

13D report must disclose, among other things, the person's ownership stake, the source of funds

for that stake, and their intentions with regards to effecting any changes at the company.

175.    Furthermore, as is critical here, Section 13(d) disclosure obligations apply to not

just a person holding beneficial ownership but to any group of persons that act together to effect

a change in control.  One need not have complete and legal ownership of a given share in order

to become a member of a group; the definition of "beneficial ownership" is quite broad and

includes, among other things, the ability to direct the voting or disposition of a security.

176.    There are limited exceptions to the obligation to file a Schedule 13D.  As

applicable here, a person or group that hold a 5% or more stake in a company *but have no*

*intentions of effecting change at the company* may file an annual report on their holdings on

Schedule 13G. Likewise, a person or group that hold a 5% or more stake in a company, and held

that stake prior to that company registering securities under Section 12 of the Exchange Act,

generally need only file a Schedule 13G and do not need to further disclose any intentions or

plans to effect a change in control. However, when a person or group qualifying for this

"grandfathered holding" adds a person to their group, they no longer qualify for the exemption

and must file a Schedule 13D.

     177.     Saieh and CorpGroup purchased a majority stake in CorpBanca in 1996. This

purchase predated the Bank's registration or sale of any shares or ADRs in the United States. In

essence, Saieh's and CorpGroup's holdings were grandfathered in and exempt from the filing of

any Schedule 13D.

     178.     On January 29, 2014, Saieh's holding company, CorpGroup, entered the

Transaction Agreement and finalized but did not sign the Shareholders Agreement. Section 4.4

of the Transaction Agreement provides in relevant part:

     4.4 Shareholders' Approvals.

     ****

     (g) At any CorpBanca Shareholders' Meeting or any CorpBanca Colombia Shareholders'
Meeting, or in connection with any written consent of the CorpBanca Common Stock
Holders or the holders of CorpBanca Colombia Common Stock, Corp Group Parent will
vote its shares of CorpBanca Common Stock and CorpBanca Colombia Common Stock,
and Corp Group Parent will cause CorpBanca Colombia to vote its shares of CorpBanca
Colombia Common Stock, and CorpBanca will vote its shares of CorpBanca Colombia
Common Stock, in each case (i) in favor of the Transactions, as applicable, and any
proposal to adjourn or postpone the CorpBanca Shareholders' Meeting or the CorpBanca
Colombia Shareholders' Meeting to a later date if there are not sufficient votes to obtain
the CorpBanca Shareholder Approval or the CorpBanca Colombia Shareholder Approval,
as applicable, and (ii) against any Contract, transaction or proposal that relates to an
Acquisition Proposal. Each of Corp Group Parent and CorpBanca agrees that it will not
(A) sell, short sell, transfer, assign, tender or otherwise dispose of any of its shares of
CorpBanca Common Stock or CorpBanca Colombia Common Stock, as applicable, (a
"Transfer") in a manner that would result in Corp Group Parent or CorpBanca, as
applicable, not having the full and exclusive ability to vote such shares, (B) take any

action that would result in Corp Group Parent or CorpBanca, as applicable, not having full and exclusive power to vote the shares (whether through delivery of a proxy to a third Person, entry into a voting agreement, depositing such shares into a voting trust or otherwise) or (C) enter into any Contract with respect to any such action or Transfer; *provided* that the foregoing limitations will not apply to the incurrence of any Lien not prohibited to be incurred under the Shareholders' Agreement.

179.    Section 4.4(g) comprises a broad agreement among Itaú, Saieh, and CorpGroup for Saieh and CorpGroup to hold, refrain from divesting, and vote their majority holding of CorpBanca stock at the direction of Itaú in favor of the Itaú Transaction.  Itaú thus acquired the right to direct the voting and/or disposition of the Saieh- and CorpGroup-held block of CorpBanca shares, which were in excess of 5% of CorpBanca's shares as of the date of the Transaction Agreement.  Saieh and CorpGroup certain of the shareholder rights, including certain voting rights and dividend rights, over the Saieh- and CorpGroup-held block of CorpBanca shares.  Significantly, Itaú acquired this right post-registration and thus did not qualify for Saieh and CorpGroup's previous exemption. By signing the Transaction Agreement, Saieh and CorpGroup, together with their new partner, Itaú, formed a new, non-exempt Section 13(d) group.

180.    Furthermore, Section 4.4(g) of the Transaction Agreement together with the Shareholders Agreement makes clear that the Itaú Transaction will effect a change in control from Saieh and CorpGroup to Itaú.  For example, in the March 12, 2014 Merger Q&A, CorpBanca disclosed that one of the "key terms" of the shareholders' agreement to be signed between CorpGroup and Itaú is that Itaú "will be the sole controlling shareholder of the Chilean Bank."

181.    Thus, although Saieh and CorpGroup were previously exempt from filing a Schedule 13D because they acquired their shares before CorpBanca's securities registration, when Saieh and CorpGroup added a new member, Itaú, to their existing group via the

Transaction Agreement and did so for the purpose of effecting a change in control at CorpBanca, they were no longer eligible for exemptions from filing a Schedule 13D.

182.     Despite incurring an obligation to file a Schedule 13D on January 29, 2014 in connection with their new group, Saieh and CorpGroup have to date failed to make any such filing.

183.     Defendants have likewise yet to make full and complete disclosures regarding all of the components and agreements that constitute the Itaú Transaction. But the limited disclosures they have made suggest that there may well be additional members in their group. For example, the 3/12/14 Merger Q&A states that, as "1st Step" of the Itaú Transaction, "[t]he controlling shareholder of CorpGroup will transfer a 1.53% stake in CorpBanca to certain non-affiliated parties[.]" It further discloses that "CorpGroup intends to sell those [1.53% of] shares to certain minority shareholders of CorpGroup[.]" Then, "the controlling Shareholder of CorpGroup intends to buy-out the same minority shareholders from CorpGroup." To the extent Saieh and CorpGroup have entered an agreement regarding those shares and their counterparties have some beneficial ownership of CorpBanca shares, including the 1.53% or otherwise, those counterparties would also be members of the group that are required to file full and complete disclosures.

184.     Saieh's and CorpGroup's failure is not mere oversight. It is a critical component of Defendants' fraudulent scheme to hide from the public that Saieh and CorpGroup are bleeding CorpBanca to secure short term liquidity, cash, and long-term benefits in a deal with Itaú. The provisions of Section 13(d) require Saieh and CorpGroup to file full and complete disclosures concerning, among other things, their intentions, agreements, and acts related to the change in control at CorpBanca.

185.    Their failure to fulfill their filing and disclosure obligations has deprived the market of the full and complete disclosures—namely that Saieh and CorpGroup crafted a sale of CorpBanca designed to benefit themselves at the cost of minority shareholders via the numerous side benefits articulated and discussed above.

186.    Injunctive relief is critical here and necessary not only for the protection of minority holders of CorpBanca securities, but also to protect the investing public from active fraud.  Saieh and CorpGroup must be enjoined from exercising any shareholder rights, including franchise rights, until (i) they file the full and complete disclosures required in a Schedule 13D, and (ii) the market has sufficient time to cool off after receiving, reviewing, and correcting for those disclosures.[3]

## COUNT I
## (Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against all Defendants)

187.    Cartica repeats and realleges each and every allegation articulated in paragraphs 1 through 186 as if fully stated here.

188.    Defendants, individually or in concert, by the use of means or instrumentalities of interstate commerce and of the United States mails:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; (iii) deceived Cartica as alleged above;

---

[3]  The allegations in this Complaint are based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters, based on the evidence articulated in the complaint and an investigation conducted by Plaintiffs' counsel, including, among other things:  (i) review and analysis of CorpBanca's public filings with the SEC; (ii) review and analysis of CorpBanca's public filings with the SVS; (iii) review and analysis of other publicly available information including, but not limited to, press releases, public statements, news articles, certain investor presentations, and other publications disseminated by or concerning CorpBanca; (iv) review and analysis of CorpBanca's analyst conference calls; and (v) review and analysis of securities analysts' reports concerning CorpBanca. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

(iv) caused Plaintiffs to hold its ADRs throughout the merger talks period and purchase additional securities during that period and after the deal was announced in reliance upon the misrepresentations and omissions; and (v) harmed Cartica. Defendants harmed Cartica by initiating and entering the Itaú Transaction that will (i) transfer significant shareholder value from minority shareholders such as Cartica to controlling shareholders Saieh and CorpGroup, causing the value of Cartica's ADRs to drop precipitously in concert with the announcement of the Itaú Transaction, (ii) create long-term and irreparable restriction of the post-merger bank's capital employment and structure, and (iii) provide to Saieh unquantifiable benefits (and commensurate harm to minority shareholders) through various put and call provisions. Defendants were primary participants in the wrongful and illegal conduct alleged here.

189.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of conduct that operated as a fraud or deceit upon Plaintiffs as holders of CorpBanca securities traded on a U.S. exchange.

190.   Additional facts supporting the Defendants' liability include the following: (i) each was a controlling shareholder, director, or high-level executive of CorpBanca; (ii) by virtue of each Defendants' rights, responsibilities, and activities as a controlling shareholder, director, or high-level executive of CorpBanca, each had contact with other members of the Bank's board and management team, access to internal reports and other data and information about the true nature of the merger solicitation, negotiation, and ultimate consummation, and/or participated in the merger solicitation, negotiation, and consummation; and (iii) each Defendant was aware of

the Bank's dissemination of information to the investing public that each knew or recklessly disregarded was materially false and misleading.

191.    Defendants had actual knowledge of the misrepresentations and omissions of material facts stated here or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were made knowingly or recklessly and for the purpose and consequence of effecting the Itaú Transaction that if permitted to close will (i) inequitably transfer unquantifiable, enormous, short- and long-term benefits to Saieh and CorpGroup at the expense of Plaintiffs and the value of their ADRs, and (ii) artificially restrict the post-merger bank's long-term capital structure.

192.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as stated above, Cartica held its ADRs throughout the merger solicitation and negotiation period, and purchased additional securities during that period and after the Itaú Transaction announcement in reliance on Defendants' misrepresentations and omissions.  The misrepresentations and omissions were designed to accomplish exactly this—a favorable response from minority shareholders.  As a direct result of the fraud, Cartica was effectively foreclosed from the opportunity to knowledgably act with respect to the merger solicitation and negotiation period.  Cartica was first harmed when Defendants entered and announced the consummation of the Itaú Transaction, which effectively shifted a substantial portion of the value of Cartica's securities to Saieh and CorpGroup.  Absent an injunction, the Itaú Transaction will be effected and will restrict the post-merger bank's long-term capital structure.  Likewise, the put and call options granted to Saieh that will cause unquantifiable harm over the next five- and eight-year periods will become permanent and will be unable to be

redressed. And Cartica's losses will also become permanent while richly rewarding Saieh and CorpGroup for their deception.

193.    Defendants explicitly solicited investors in part via communications in the United States that were directed at U.S. investors, including Cartica. Among other things, Defendants filed a registration statement on April 14, 2011 and subsequently filed several prospectuses with the SEC thereafter in connection with CorpBanca's public offering of its common shares in the form of ADRs. Defendants also participated in numerous investor presentations in the U.S., including annual shareholder presentations in New York. Additionally, various CorpBanca representatives, including the Officer Defendants, transmitted information concerning CorpBanca into the United States through conference calls, press releases, annual reports, SEC filings, CorpBanca's website, and other means. Finally, Defendants have consciously and deliberately targeted the U.S. market and placed themselves firmly within its jurisdiction. As CorpBanca's Chairman, Defendant Jorge Andrés Saieh Guzman explains in his letter introducing the Bank's annual report, CorpBanca's "international expansion, which began a few years ago with the opening of the New York Branch . . . brings CorpBanca into markets that are strategic for many Chilean companies and entrepreneurs, precisely the type of international development we seek to facilitate."

194.    As a result of CorpBanca's explicit solicitation in the United States, investors including Cartica bought CorpBanca ADRs. Cartica purchased CorpBanca ADRs via domestic transactions in the United States. Cartica performed in the United States (i) its evaluation of its investment in CorpBanca ADRs traded on the New York Stock Exchange, (ii) its decision to purchase those securities, (iii) its later decision to purchase additional CorpBanca ADRs, and (iv) its ultimate decision to hold those securities throughout the merger talks period and purchase

additional securities during that period and after the Itaú Transaction announcement. Cartica has already been harmed and will continue to experience irreparable harm due to the lack of full and fair disclosure and fraudulently misleading statements made by Defendants. Further, Cartica has experienced harm in the United States based on the loss in value of the ADRs. If the Itaú Transaction is permitted to close, Cartica will be irreparably harmed in the United States because the deal will (i) inequitably transfer enormous benefits to Saieh and CorpGroup at the expense of Plaintiffs and the value of their ADRs, (ii) artificially restrict the post-merger bank's long-term capital structure for years to come, and (iii) the unquantifiable put and call rights will become permanent and will be unable to be redressed.

195.    Absent a preliminary injunction temporarily halting the Itaú Transaction in order to preserve the status quo, the merger will continue to roll toward its consummation and closing, at which point it will be impossible to unwind the newly formed banking enterprise that will span multiple countries. Such continued progress in the Itaú Transaction will irreparably harm Cartica by moving it further from the true intrinsic value of each of its over 10 billion shares and step-by-step closer to (i) restricting the bank's long-term capital, and (ii) permanently transferring great but unquantifiable value from shareholders into Saieh's pocket.

196.    Equity and the securities laws demand a pause here to prevent irreparable harm to Cartica.

197.    Ultimately, a permanent injunction is also warranted. The Itaú Transaction is the direct and inextricable product of Defendants' fraudulent actions and would, if permitted to resume and close, permanently and irreparably harm Cartica. Absent a permanent injunction enjoining Defendants from taking any further steps to close the Itaú Transaction and/or secure any regulatory approval for the that is inextricably the product of Defendants' fraud, minority

shareholders including Cartica will be permanently deprived of (i) an efficient capital structure unhindered by artificial restraints that the Itaú Transaction would otherwise force upon the post-merger bank, and (ii) a transfer of incalculable value from its ADRs to Saieh's pocket in the form of the numerous side benefits he has built into the Itaú Transaction.

198.    Accordingly, Cartica is entitled to (i) a declaration that Defendants violated Section 10(b) and SEC Rule 10b-5; (ii) awarding temporary equitable and injunctive relief and preliminarily enjoining Defendants from taking any further steps to close the Itaú Transaction and/or secure any regulatory approval for the merger in order to preserve the status quo and prevent irreparable harm to Plaintiffs; (iii) an order awarding equitable and injunctive relief and permanently enjoining Defendants from taking any further steps to close the Itaú Transaction and/or secure any regulatory approval for the merger, a deal that is inextricably the product of Defendants' fraud; (iv) an order enjoining Defendants from any trading in CorpBanca stock until they correct by public means their material misstatements and omissions in the 11/29/13 6-K, the 12/12/13 6-K, the 12/19/13 6-K, the 1/20/14 6-K, the 1/30/14 Merger 6-K, and the 1/30/14 Press Release 6-K; (v) an order enjoining Defendants from exercising any rights as CorpBanca shareholders, including their voting rights, until Defendants correct by public means their material misstatements and omissions in the 11/29/13 6-K, the 12/12/13 6-K, the 12/19/13 6-K, the 1/20/14 6-K, the 1/30/14 Merger 6-K, and the 1/30/14 Press Release 6-K; and (vi) an order permanently enjoining Defendants from making any further misstatements or omission in connection with, or otherwise related to, their public filings and/or statements related to the Itaú Transaction or similar transaction.

199.    Cartica has no adequate remedy at law.

## COUNT II
### (Violation of Section 20(a) of the Exchange Act)
### Against Defendants Saieh, CGB, and the Director/Officer Defendants

200.     Cartica repeats and realleges each and every allegation articulated in paragraphs 1 through 199 as if fully stated here.

201.     Saieh acted as a controlling person of CorpGroup—referring here to Corp Group Banking S.A., or CGB, and Companía Inmobiliaria y de Inversiones Saga Limitada, or Saga—within the meaning of Section 20(a) of the Exchange Act.  Indeed, CorpBanca has disclosed in its Form 20-F annual report filed with the SEC that Saieh controls both CGB and Saga:

> "Corp Group Financial Chile B.V., or CGFC, indirectly own[s] 100% of the outstanding capital stock of Corp Group Banking S.A., or CGB. CGFC is controlled by Mr. Saieh Bendeck who, together with his family, indirectly owns a majority of its voting stock. Accordingly, beneficial ownership of CGB's shares is attributed to Mr. Saieh Bendeck and his family. . . .  Companía Inmobiliaria y de Inversiones Saga Ltda., or Saga, is indirectly controlled by Mr. Saieh Bendeck and his spouse.  Accordingly, beneficial ownership of Saga's shares is attributed to Mr. Saieh Bendeck and his spouse."

Saieh thus had the power to control or influence and did in fact control and influence the particular acts of CGB and Saga giving rise to the securities violations alleged and described above.  As a controlling person of CGB and Saga, Saieh is liable pursuant to Section 20(a) of the Exchange Act.

202.     Saieh also acted as a controlling person of CorpBanca within the meaning of Section 20(a) of the Exchange Act.  Indeed, CorpBanca has disclosed in its Form 20-F annual report filed with the SEC that Saieh "holds shares with sufficient voting power under Chilean law to approve substantially all of the forms of [CorpBanca] corporate action."  Saieh thus had the power to control or influence and did in fact control and influence the particular acts of CorpGroup giving rise to the securities violations alleged and described above.  As a controlling person of CorpGroup, Saieh is liable pursuant to Section 20(a) of the Exchange Act.

203.    Saieh exercises his control over CorpBanca through Corp Group Banking S.A., or CGB, and thus the holding company is also liable as a control person under Section 20(a) of the Exchange Act.  CorpBanca's most recent Form 20-F concedes as much, describing CGB as "[o]ur controlling shareholder, . . . which in turn is controlled by Mr. Alvaro Saieh Bendeck" and noting that "substantially all of the forms of corporate action can be approved by our controlling shareholder, Corp Group Banking."  CGB culpably participated in Saieh's fraudulent scheme by utilizing that control to push CorpBanca into a transaction that disproportionally benefitted its own stake in the company—*i.e.*, Saieh's stake in the company—at the expense of all other shareholders.  CGB thus had the power to control or influence and did in fact control and influence the particular acts of CorpBanca giving rise to the securities violations alleged and described above.  As a controlling person of CorpBanca, CGB is liable pursuant to Section 20(a) of the Exchange Act.

204.    Defendants Jorge Andrés Saieh Guzmán, Fernando Aguad Dagach, Jorge Selume Zaror, Rafael Guilisati Gana, Francisco León Délano, Francisco Mobarec Asfura, Gustavo Arriagada Morales, José Luis Mardones Santander, Hugo Verdegaal, María Catalina Saieh Guzmán, and Ana Beatriz Holuigue Barros are also liable as control persons of CorpBanca under Section 20(a) of the Exchange Act.  First, as directors of the Bank, they had knowledge of the false and misleading nature of CorpBanca's statements and the power to control those statements, including (i) statements related to assurances that the Bank would seek a transaction that would secure equal treatment and value for each share, and (ii) subsequent misstatements that the Itaú Transaction did secure equal treatment and value for each share.  Second, as directors of the Bank, they also had the power to control the officers issuing statements on behalf of the Bank and negotiating the terms of the Itaú Transaction, a deal whose terms directly

contradicted the Bank's statements. According to CorpBanca's 2013 Form 20-F, CorpBanca is managed by the Chief Executive Officer "under the direction of our Board of Directors." With the Chief Executive Officer, these directors appoint all the executive officers of the Banks and have the power to remove the officers should they choose to do so. Third, as directors of the Bank, they also had the authority to approve or reject the Itaú Transaction, one they knew to be the product of fraud. According to the 1/30/2014 Merger 6-K filing, the "Committee of Directors," consisting of Defendants Morales, Verdegaal, and Santander, reviewed and provided to the full Board of Directors a "favorable report" regarding the Itaú Transaction. The full board of directors, comprising Defendants Jorge Andrés Saieh Guzmán, Dagach, Zaror, Gana, Délano, Asfura, Morales, Santander, Verdegaal, María Catalina Saieh Guzmán, and Barros then reviewed and voted to approve the Itaú Transaction. The Director Defendants thus had the power to control or influence and did in fact control and influence the particular acts of CorpBanca giving rise to the securities violations alleged and described above. As controlling persons of CorpBanca, the Director Defendants are liable pursuant to Section 20(a) of the Exchange Act.

205.    As Chief Executive Officer and Chief Financial Officer of CorpBanca, respectively, Defendants Fernando Massú Tare and Eugenio Gigogne Miqueles are both senior officers of CorpBanca and liable as control persons of CorpBanca under Section 20(a) of the Exchange Act. According to CorpBanca's 2013 Form 20-F, Defendant Massú as the Bank's CEO is empowered, along with the Board of Directors, to "manage[]" the company, as well as to hire and fire all other officers. Defendants Massú and Gigogne, as the CEO and CFO, signed CorpBanca's securities filings related to the Itaú Transaction that were filed with the Chilean securities regulators and subsequently with the SEC. Defendants Massú and Gigogne thus had the power to control or influence and did in fact control and influence the particular acts of

CorpBanca giving rise to the securities violations alleged and described above.  As controlling persons of CorpBanca, Defendants Massú and Gigogne are liable pursuant to Section 20(a) of the Exchange Act.

206.    Each of the 20(a) Defendants named in this Count were provided with or had access to copies of the Bank's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

207.    As articulated and alleged above, each of the 20(a) Defendants had control over persons or entities who violated § 10(b) of the Exchange Act and Rule 10b-5.  As controlling persons, the 20(a) Defendants named in this count are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate cause of the 20(a) Defendants' wrongful conduct, Cartica has suffered harm and will continue to suffer irreparable harm should the Itaú Transaction be permitted to close.

208.    Cartica has no adequate remedy at law.

## COUNT III
### (Violation of Section 13(d) of the Exchange Act and SEC Rules 13d-1 and 13d-5)
### Against Defendants Saieh, CGB, and Saga

209.    Cartica repeats and realleges each and every allegation articulated in paragraphs 1 through 208 as if fully stated here.

210.    In violation of Section 13(d) of the Exchange Act, SEC Rule 13d-1 and SEC Rule 13d-5, neither Saieh, CGB, nor Saga have filed or caused to be filed a Schedule 13D disclosing their agreement together with Itaú to act as a group for the purpose of acquiring, holding, voting, or disposing of a block of CorpBanca common shares in excess of 5% outstanding common shares in order to effect a change in control at CorpBanca.

211.    As discussed above, Saieh, CGB, and Saga had an obligation to disclose that they had formed a group with Itaú via their agreement in Section 4.4(g) of the Transaction Agreement to hold and refrain from divesting the majority of CorpBanca shares held by Saieh, CGB, and Saga, an agreement that gave each member of the group shared beneficial ownership of the CGB- and Saga-held block of CorpBanca shares.  Furthermore, Saieh, CGB, and Saga entered the agreement with Itaú for the purpose of effecting a change in control at CorpBanca whereby control would be shifted from Saieh, CGB, and Saga to Itaú.

212.    This failure to file a Schedule 13D stock deprives CorpBanca's shareholders and the marketplace of the full and accurate information to which they are entitled and both CorpBanca and its shareholders, including Cartica, will be irreparably harmed.

213.    Accordingly, Cartica is entitled to (i) a declaration that Saieh, CGB, and Saga violated Section 13(d) and SEC Rules 13d-1 and 13d-5; (ii) an order requiring Saieh, CGB, and Saga to file the full and accurate disclosures required by Section 13(d) and SEC Rules 13d-1 and 13d-5; (iii) an order enjoining Saieh, CGB, and Saga from any trading in CorpBanca stock until they file the full and accurate disclosures required by Section 13(d) and SEC Rules 13d-1 and 13d-5; (iv) an order enjoining Saieh, CGB, and Saga and other persons acting in concert with them from exercising any rights as CorpBanca stockholders, including their rights to vote, until they file the full and accurate disclosures required by Section 13(d) and SEC Rules 13d-1 and 13d-5 *and* the market has had a sufficient cooling off period within which to absorb and correct for the failure of Saieh, CGB, and Saga to comply with Section 13(d) and SEC Rules 13d-1 and 13d-5; and (v) a permanent injunction preventing Saieh, CGB, and Saga from making any misstatements or omissions in connection with, or otherwise related to, their Schedule 13D filings.

214.    Cartica has no adequate remedy at law.

## COUNT IV
### (Violation of Section 20(a) of the Exchange Act)
### Against Defendant Saieh

215.    Cartica repeats and realleges each and every allegation articulated in paragraphs 1 through 214 as if fully stated here.

216.    Saieh acted as a controlling person of CorpGroup—referring here to Corp Group Banking S.A., or CGB, and Companía Inmobiliaria y de Inversiones Saga Limitada, or Saga—within the meaning of Section 20(a) of the Exchange Act. Indeed, CorpBanca has disclosed in its Form 20-F annual report filed with the SEC that Saieh controls both CGB and Saga:

> "Corp Group Financial Chile B.V., or CGFC, indirectly own[s] 100% of the outstanding capital stock of Corp Group Banking S.A., or CGB. CGFC is controlled by Mr. Saieh Bendeck who, together with his family, indirectly owns a majority of its voting stock. Accordingly, beneficial ownership of CGB's shares is attributed to Mr. Saieh Bendeck and his family. . . . Companía Inmobiliaria y de Inversiones Saga Ltda., or Saga, is indirectly controlled by Mr. Saieh Bendeck and his spouse. Accordingly, beneficial ownership of Saga's shares is attributed to Mr. Saieh Bendeck and his spouse."

Saieh thus had the power to control or influence and did in fact control and influence the particular acts of CGB and Saga giving rise to the securities violations alleged and described above. As a controlling person of CGB and Saga, Saieh is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate cause of Saieh's wrongful conduct, Cartica has suffered harm and will continue to suffer irreparable harm, along with its fellow shareholders and the investing public, should CGB and Saga continue to ignore their reporting obligations and refuse to file the full and complete disclosures required by Section 13(d) and SEC Rules 13d-1 and 13d-5.

217.    Cartica has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Cartica respectfully requests judgment against Defendants as follows:

a)      declaring and determining that Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 through their actions as alleged and described above;

b)      awarding *temporary* equitable and injunctive relief and *preliminarily* enjoining Defendants from taking any further steps to close the Itaú Transaction and/or secure any regulatory approval for the merger in order to preserve the status quo and prevent irreparable harm to Plaintiffs;

c)      awarding equitable and injunctive relief and *permanently* enjoining Defendants from taking any further steps to close the Itaú Transaction and/or secure any regulatory approval for the merger, a deal that is inextricably the product of Defendants' fraud;

d)      enjoining controlling shareholder Saieh and CGB, as well as any other persons or entities acting in concert with them, from exercising any rights as CorpBanca shareholders, including their voting rights, until Defendants correct by public means their material misstatements and omissions in the 11/29/13 6-K, the 12/12/13 6-K, the 12/19/13 6-K, the 1/20/14 6-K, the 1/30/14 Merger 6-K, and the 1/30/14 Press Release 6-K;

e)      enjoining Defendants from making any further misstatements or omission in connection with, or otherwise related to, their public filings;

f)      declaring that Saieh, CGB, and Saga violated Section 13(d) of the Exchange Act and SEC Rules 13d-1 and 13d-5 by failing to file the full and accurate disclosures required by Section 13(d) of the Exchange Act and SEC Rules 13d-1 and 13d-5;

g)      ordering Saieh, CGB, and Saga to file the full and accurate disclosures required by Section 13(d) of the Exchange Act and SEC Rules 13d-1 and 13d-5;

h)      enjoining Saieh, CGB, and Saga and other persons or entities acting in concert with them from exercising any rights as CorpBanca stockholders, including their voting rights, until (i) Saieh, CGB, and Saga have filed the full and accurate disclosures required by Section 13(d) of the Exchange Act and SEC Rules 13d-1 and 13d-5, (ii) and the market has had a sufficient cooling off period within which to absorb and correct for Saieh's, CGB's, and Saga's failure to comply with Section 13(d) and SEC Rules 13d-1 and 13d-5;

i)      awarding Cartica its costs and disbursements in this action, including reasonable attorneys' and experts' fees and other disbursements; and

j)      granting Cartica such other and further relief as this Court may deem just and proper.

Dated:   New York, New York
         April 1, 2014

GIBSON, DUNN & CRUTCHER LLP

By:   _____
      Adam H. Offenhartz
      David J. Kerstein
      James M. Thompson

200 Park Avenue
New York, New York 10166-0193
Phone: (212) 351-4000
Fax: (212) 351-4035

*Attorneys for Plaintiffs Cartica Management, LLC, Cartica Corporate Governance Fund, LP; Cartica Investors, LP; and Cartica Capital Partners Master, LP*