UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

CARTICA MANAGEMENT, LLC, et al.,

                        Plaintiffs,

        -against-

CORPBANCA, S.A., et al.,

                        Defendants.

------------------------------------------------------x

**USDS SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: 9-25-14

14-cv-2258 (PKC)

MEMORANDUM
AND ORDER

CASTEL, U.S.D.J.

        Plaintiffs (collectively, "Cartica") bring this action, alleging that defendants committed securities fraud in connection with a forthcoming merger of CorpBanca and Banco Itaú Chile. Cartica asserts claims pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. § 78u-4(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, Section 13(d) of the '34 Act, 15 U.S.C. § 78m, and Rules 13d-1 and 13d-5 promulgated thereunder, 17 C.F.R. § 240.13d-1 and 17 C.F.R. § 240.13d-5, and Section 20(a) of the '34 Act, 15 U.S.C. § 78t. Cartica also asserts a claim for common law fraud. It requests injunctive relief on its federal securities claims, but seeks damages on its common law fraud claim. The defendants move to dismiss.

        In <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723 (1975), the Supreme Court examined the text of section 10(b) and Rule 10b-5 and concluded that a claim could not be asserted by a shareholder who was neither a "purchaser" nor "seller" in relation to the alleged fraud. <u>Blue Chip</u> was decided in the context of a money damages claim and, since then, neither the Supreme Court nor the Second Circuit has decided whether a claim for injunctive relief is subject to the same rule. This Court accepts the District of Columbia Circuit's reasoning that

"[w]hile it may be possible to discern differences between an action for damages and a suit for an injunction, most of the Supreme Court's argument in Blue Chip applies quite as much to the latter as to the former."  Corwin v. Bresler, 741 F.2d 410, 424 (D.C. Cir. 1984).  As will be explained, this Court applies the purchaser or seller rule to Cartica's section 10(b) claim and dismisses that claim.

With respect to Cartica's section 13(d) claim, there is no purchaser or seller requirement and thus Cartica may assert such a claim.  However, on a motion to dismiss, this Court may properly consider the text of the disclosures alleged to be false.  Corrective disclosures made by certain defendants foreclose Cartica's claim for injunctive relief and that claim will be dismissed as well.  Because the complaint fails to plead a primary violation, Cartica's section 20(a) claims are also dismissed.  With all federal claims dismissed, the Court declines to exercise supplemental jurisdiction over the common law fraud claims.

I.   Background

For the purposes of defendants' motions, all non-conclusory factual allegations are accepted as true, see Ashcroft v. Iqbal, 556 U.S. 662 (2009), and all reasonable inferences are drawn in favor of the plaintiff as non-movant.  See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

a.   Parties

Defendant CorpBanca, S.A. is a publicly-traded company based in Santiago, Chile, organized under the laws of Chile and licensed by the Chilean Superintendency of Banks and Financial Institutions to operate as a commercial bank.  (Am. Compl. ¶ 38.)  It is subject to the reporting requirements of the Chilean Superintendency of Securities and Insurance and files periodic reports, known as "material fact notices," with the Superintendency.  (Am. Compl. ¶ 39.)  CorpBanca shares are traded on the Santiago Stock Exchange and Chilean Electronic

Exchange.  (Am. Compl. ¶ 39.)  CorpBanca's ADRs are traded on the NYSE under the symbol "BCA."  (Am. Compl. ¶ 40.)

Plaintiff Cartica first purchased CorpBanca shares in October 2012, apparently extraterritorially.  On January 18, 2013, it purchased 1.2 million American Depository Receipts ("ADRs") in United States transactions during CorpBanca's public offering.[1]  (Am. Compl. ¶ 33.)  The Cartica funds own approximately 11 billion shares, including common shares and shares represented by ADRs, representing approximately 3.22% of CorpBanca's outstanding common stock.  (Am. Compl. ¶ 36.)

Defendant Álvaro Saieh Bendeck ("Saieh") is the Chairman and controlling shareholder of privately-held Corp Group and the controlling shareholder of CorpBanca through Corp Group and other investments.  (Am. Compl. ¶ 43.)  As of December 31, 2013, Saieh controlled approximately 50.44% of CorpBanca's outstanding shares through holding companies, including defendants Corp Group Banking S.A., which holds approximately 45.26% of CorpBanca's common shares, and Companía Inmobiliaria y de Inversiones Saga Limitada ("Saga"), which holds approximately 5.18% of CorpBanca's common shares.  (Am. Compl. ¶¶ 44, 46-47.)  According to CorpBanca's 2012 20-F form, Saieh held shares with sufficient voting power to approve all forms of corporate action subject to decision by shareholders' meetings.  (Am. Compl. ¶ 45.)  Corp Group also has a controlling interest in SMU (Chile's third-largest supermarket operator), Copesa (a media conglomerate), and real estate and insurance operations.  (Am. Compl. ¶ 43.)  The Court refers to these defendants collectively as "Corp Group" or the

---

[1] Cartica Management, LLC, an investment advisor registered with the SEC, is a Delaware LLC with its principal place of business in Washington DC.  (Am. Compl. ¶ 31.)  Plaintiffs Cartica Corporate Governance Fund, LP, Cartica Investors, LP, and Cartica Capital Partners Master, LP are each private investment funds managed by Cartica Management, LLC, and are the beneficial owners of CorpBanca ADRs and additional CorpBanca shares.  (Am. Compl. ¶ 32.)  Cartica Investors II, L.P., another fund managed by Cartica Management, LLC, is the beneficial owner of CorpBanca shares.  (Am. Compl. ¶ 32.)

"Corp Group defendants."  Defendants also include directors and officers of CorpBanca.  (Am. Compl. ¶¶ 48, 56, 59-60.)

Defendant Itaú Unibanco Holding S.A. is a publicly-held corporation organized under the laws of Brazil.  Itaú's preferred shares have traded in the form of ADRs on the NYSE, under the symbol "ITUB" since February 2002.  Itaú files Form 20-Fs and Form 6-Ks with the SEC.  (Am. Compl. ¶ 61.)  Defendant Banco Itaú Chile is a subsidiary of Itaú Unibanco Holding S.A. and is a corporation organized under the laws of Chile.  (Am. Compl. ¶ 62.)

b.  The Transaction at Issue

CorpBanca and Itaú announced in January 2014 that they entered into a proposed merger agreement (the "Transaction Agreement").  (Am. Compl. ¶ 91.)  If the merger is approved, 172 billion new shares of CorpBanca stock will be issued to the shareholders of Banco Itaú Chile.  The current shareholders of CorpBanca will retain 66.42% of the shares of the merged bank.  After closing, the aggregate number of shares of the merged bank will increase from 340 billion to 512 billion duly subscribed and fully paid shares.  (Slocum Decl. Ex. 4.)

Saieh gained a majority interest in CorpBanca in 1996.  (Am. Compl. ¶ 63.)  He does not have sufficient voting power to approve the proposed merger, which requires a vote of two-thirds or more shareholders.  (Am. Compl. ¶ 138.)

SMU, the supermarket operator controlled by Corp Group, lost $720 million in the first nine months of 2013.  SMU disclosed accounting errors and increased its stated liabilities in a restatement.  (Am. Compl. ¶ 70.)  Saieh fired 7,000 SMU employees, returned as chairman of SMU's board, and injected $300 million into the chain, 60% of which were from his personal funds.  (Am. Compl. ¶ 71.)

On November 29, 2013, CorpBanca disclosed that it had retained "international investment banks" to analyze "potential transactions" involving the bank and other bank

operators.  (Am. Compl. ¶¶ 82, 140.)  On December 6, 2013, Moody's cut CorpBanca's credit

rating from Baa3 to Baa2, citing the problems at SMU.  (Am. Compl. ¶ 84.)

            In December 2013, Saieh and CorpBanca made public statements that they would

only accept a bid that would permit Saieh to retain some control of CorpBanca.  (Am. Compl. ¶

102.)  Concerned by these statements, Cartica's director, Tessa Barger, met with Saieh in New

York on December 9, 2013, and stated, in substance, that any transaction that included special

benefits for Saieh that "did not inure to all shareholders equally would unacceptably and

unlawfully shift value from minority shareholders to Saieh."  On December 20, 2013, in a letter

to Saieh, Barger restated the need to secure the highest value for all shareholders.  (Am. Compl.

¶ 102.)  Saieh affirmed to Cartica that he would not seek personal benefits, but that he would

seek a transaction with the maximum benefit for all shareholders.  (Am. Compl. ¶ 103.)  Based

on Saieh's representations, Cartica purchased an additional 188 million CorpBanca shares and

continued to hold its CorpBanca ADRs.  (Am. Compl. ¶ 103.)  Cartica does not allege that the

additional shares were purchased within the United States, and the shares, as distinguished from

ADRs, are not alleged to be publically traded in the United States.

            On January 29, 2014, CorpBanca announced that it reached an agreement in

which Itaú would merge its Chilean and Colombian units with CorpBanca.  (Am. Compl. ¶ 91.)

The Transaction Agreement provided that Corp Group would vote its CorpBanca shares in favor

of the proposed merger.  (Slocum Decl. Ex. 8.1. § 4.4(g))

            On January 30, 2014, the day after the announcement of the transaction,

defendants provided disclosures to certain shareholders in an early morning meeting, to which

Cartica was not invited.  (Am. Compl. ¶ 107.)  Defendants also provided disclosures about the

transaction via a public call.  (Am. Compl. ¶¶ 106, 153.)  CorpBanca filed a 6-K which

announced the agreement and attached a Merger Notice.  (Am. Compl. ¶ 151.)  On the same

date, CorpBanca filed a separate Form 6-K disclosing that it had announced the merger via a

press release, which characterized the merger as a "stock-for-stock transaction."  (Am. Compl. ¶

152.)

In February 2014, Cartica purchased an additional 2 billion CorpBanca shares.

(Am. Compl. ¶ 105.)  Cartica does not allege that the additional shares were purchased in the

United States.

In March 2014, CorpBanca issued a public letter responding to questions raised

by Cartica.  (Am. Compl. ¶ 154.)  CorpBanca also published a series of questions and answers,

which included some of the alleged benefits Saieh would reap from the transaction.  (Am.

Compl. ¶ 155.)

On March 14, 2014, defendants disclosed the text of the Transaction Agreement

and the Shareholders Agreement on CorpBanca's website.  (Am. Compl. ¶ 109.)  Cartica alleges

that the Shareholders Agreement and Transaction Agreement provide special benefits to Saieh

and Corp Group at the expense of minority shareholders, including the following: (i) Itaú's

subsidiary will provide Corp Group with a $1.2 billion credit line at a highly favorable interest

rate; (ii) the post-merger bank will purchase all of Corp Group's CorpBanca Colombia shares for

an inflated price; and (iii) Corp Group will receive put and call rights.  The complaint alleges that

Corp Group will receive additional rights or benefits which "represent[] a transfer of value from

the Bank's shareholders to CorpGroup."  (Am. Comp. ¶ 110.)

On May 29, 2014, the Corp Group defendants filed a Schedule 13D, which they

amended on June 24, 2014.  (Am. Compl. ¶ 132; Slocum Decl. Ex. 15.)  On July 7, 2014, Itaú

Unibanco Holding S.A. filed a Schedule 13D relating to the common shares of CorpBanca. (Rodriguez Decl. Ex. 3.)

Because the transaction at issue is a merger transaction in which shareholders of Banco Itaú Chile would exchange their shares of Banco Itaú Chile for shares of CorpBanca, Cartica would own the exact number of shares and ADRs of CorpBanca after the transaction that it owned before the transaction.  It is forced to part with neither its shares nor its ADRs.  Cartica does not (nor could it) challenge the fairness or adequacy of the transaction in this proceeding, which is a matter of the fiduciary duties of directors of a Chilean entity.  The federal securities claims relate solely to the adequacy and propriety of disclosures.  The amended complaint alleges that defendants have made misleading statements and omissions in their filings with the SEC, public statements, and private statements.  (Am. Compl. ¶¶ 133, 139-68.)

c.  Procedural History

Cartica filed the initial complaint in this action on April 1, 2014.  After a conference with the Court, Cartica filed an amended complaint, adding the Itaú defendants. (Docket # 48.)  Cartica's claims against defendants Fernando Aguad Dagach, Jorge Selume Zaror, Rafael Guilisati Gana, Francisco León Délano, Francisco Mobarec Asfura, Gustavo Arrigada Morales, José Luis Mardones Santander, María Catalina Saieh Guzmán, and Ana Beatriz Holuigue Barros have been voluntarily dismissed without prejudice.  (Docket # 77.)  This Court previously denied Cartica's motion to lift the PSLRA discovery stay.  (Docket # 113.)

II.  Legal Standards on a Motion to Dismiss

Pursuant to Rule 12(b)(6), Fed. R. Civ. P., to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Legal conclusions are not entitled to the presumption of

truth, and a court assessing the sufficiency of a complaint disregards them.  Id.  Instead, the

Court must examine only the well-pleaded factual allegations, if any, "and then determine

whether they plausibly give rise to an entitlement to relief."  Id. at 679.  When reviewing a

motion to dismiss pursuant to Rule 12(b)(6), a court "may consider any written instrument

attached to the complaint, statements or documents incorporated into the complaint by reference,

legally required public disclosure documents filed with the SEC, and documents possessed by or

known to the plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

### III. The Section 10(b) Claim for Injunctive Relief

#### a.  The Blue Chip Rule

##### i.  Requirement of Purchase or Sale

In Blue Chip, 421 U.S. at 755, the Supreme Court held that only purchasers or

sellers of securities had standing to bring a claim under section 10(b).  The statutory language of

section 10(b) and Rule 10b-5 prohibit manipulation or deception "in connection with the

purchase or sale of any security."  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  Endorsing the

view of the Second Circuit as expressed in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d

Cir. 1952) (A. Hand, J.), the Court determined that "[t]he wording of § 10(b) directed at fraud 'in

connection with the purchase or sale' of securities."  Blue Chip, 421 U.S. at 733.[2]

---

[2] When interpreting the Securities Litigation Uniform Standards Act, the Supreme Court interpreted the language of section 10(b) and Rule 10b-5 more broadly.  Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006) (citing SEC v. Zanford, 535 U.S. 813, 820 (2002) and United States v. O'Hagan, 521 U.S. 642, 651).  In Dabit, the Supreme Court expressly stated that "[w]e do not here revisit the Blue Chip Stamps Court's understanding of the equities involved in limiting the availability of private remedies under federal law; we are concerned instead with Congress' intent in adopting a pre-emption provision, the evident purpose of which is to limit the availability of remedies under state law."  Dabit, 547 U.S. at 88 n.13.  See also Ashland Inc. v. Morgan Stanley & Co., Inc., 652 F.3d 333, 338 n.2 (2d Cir. 2011) ("Typically, a 'holder' of securities lacks standing to prosecute a claim under the federal securities laws."); Amorosa v. AOL Time Warner Inc., 409 F. App'x 412, 417 (2d Cir. 2011) ("[T]his Court agrees . . . that the Supreme Court did not announce in Dabit that Rule 10b-5 provided a cause of action for a "holder" claim.  Indeed, the Supreme Court specifically indicated that it was not revisiting the

Then-Justice Rehnquist, writing for the Court, noted that, in contrast to section 10(b), other provisions in the Securities Act of 1933 (the "'33 Act") and '34 Acts were not limited by the "purchase or sale" language in section 10(b) or Rule 10b-5.  The Court stated that "[w]hen Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly."  Id. at 734 (comparing section 16(b) of the '34 Act, 15 U.S.C. § 78p(b)).  Additionally, the Court noted that the private civil remedies for violations of section 11(a) of the '33 Act and sections 9, 12, and 18 of the '34 Act, created by Congress at the time section 10(b) was enacted, were expressly limited to purchasers or sellers of securities, concluding that "[i]t would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action."  Id. at 736.

The Court also noted that after Birnbaum, the SEC twice sought amendment of section 10(b) to include the language "in connection with the purchase or sale of, or any attempt to purchase or sell, any security."  Congress did not enact a change on either occasion.  Id. at 732.

ii.  Policy Considerations

Memorably, Justice Rehnquist observed that "[w]hen we deal with private actions under Rule 10b-5, we deal with a judicial oak which has grown from little more than a legislative acorn."  Id. at 737.  Because it is a judicially-crafted implied right of action, the Court, not "suggesting that we are able to divine from the language of § 10(b) the express 'intent of Congress' as to the contours of a private cause of action under Rule 10b-5" turned to policy considerations that could suggest a result different than that reached on the statutory analysis.  Id.

_____

limitation of standing to purchasers and sellers of securities that had been previously announced in Blue Chip." (internal citations omitted)).

The Court recognized that the "purchase or sale" requirement barred three classes of potential plaintiffs from bringing claims under section 10(b) or Rule 10b-5, including "actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material." Id. at 737-38.  Noting that such exclusion was a "disadvantage" of the requirement, the Court held that "we are of the opinion that there are countervailing advantages to the Birnbaum rule, purely as a matter of policy, although those advantages are more difficult to articulate than is the disadvantage." Id. at 739.

Foremost among the advantages was preventing potentially vexatious claims: "[w]e believe that the concern expressed for the danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b-5 is founded in something more substantial than the common complaint of the many defendants who would prefer avoiding lawsuits entirely to either settling them or trying them." Id. at 739.  Additionally, the Court noted that purchases and sales of shares are documented and easily verifiable whereas claims based upon an assertion that a shareholder would like to buy or sell will turn largely on oral testimony about subjective intentions. Id. at 742.  It also considered the settlement pressures and disruption of business resulting from unresolved claims. Id. at 740.

> b.  The Application of Blue Chip Stamps to Claims for Injunctive Relief is an Open Question in this Circuit

"[D]istrict courts and other inferior courts are bound by decisions of the Court of Appeals in the appropriate circuit unless overruled by an intervening Supreme Court decision or other change in law." United States v. Moreno, 94-cr-165 (SS), 2000 WL 1843232, at *5 (S.D.N.Y. Dec. 14, 2000) (Sotomayor, J.) (citing Ithaca Coll. V. NLRB, 623 F.2d 224, 228 (2d Cir. 1980).  The express holding in Blue Chip was "that respondent was not entitled to sue for

violation of Rule 10b-5. . . ." <u>Blue Chip</u>, 421 U.S. at 755.  As will be discussed, the Second

Circuit has not held that its pre-<u>Blue Chip</u> precedent that allowed injunctive claims under section

10(b) by one who is neither a purchaser nor seller of securities survived <u>Blue Chip</u>.  This is

consistent with Judge Cote's observation that "since the Supreme Court's decision in <u>Blue Chip</u>,

the Second Circuit has not authorized an action for injunctive relief unless the complainant was a

purchaser or seller of securities," <u>Global Intellicom, Inc. v. Thomson Kernaghan & Co.</u>, 99-cv-

342 (DLC), 1999 WL 544708, at *8 (S.D.N.Y. July 27, 1999).  It is useful to review the history

of the purchaser or seller rule in the Second Circuit.

i.   <u>Second Circuit Law before Blue Chip</u>

Almost twenty five years prior to the Supreme Court's opinion in <u>Blue Chip</u>, the

Second Circuit held that shareholders could not bring a claim for damages under Rule 10b-5

absent a "purchase or sale" of securities.  In <u>Birnbaum</u>, 193 F.2d 461, shareholders, suing on

behalf of the corporation and other shareholders, alleged that the company president and

members of the board of directors defrauded the plaintiffs by providing misrepresentations in

mailings to the shareholders regarding a rejected tender offer and the president's sale of his stock

in the corporation.  <u>Id.</u> at 462.  The Second Circuit found that "[t]he absence of a provision

[expressly providing an issuer or stockholder with a right of action] in Section 10(b) strengthens

the conclusion that that section was directed solely at that type of misrepresentation or fraudulent

practice usually associated with the sale or purchase of securities rather than at fraudulent

mismanagement of corporate affairs, and that Rule [10b-5] extended protection only to the

defrauded purchaser or seller."  <u>Id.</u> at 464.

After <u>Birnbaum</u>, but before <u>Blue Chip</u>, the Second Circuit held that there was a

narrow exception to the "purchase or sale" requirement when plaintiffs sought only injunctive

relief.  In <u>Mutual Shares Corp. v. Genesco</u>, 384 F.2d 540 (2d Cir. 1967), the Second Circuit held

- 11 -

that Birnbaum did not bar standing for an injunctive relief claim brought by shareholders

pursuant to Rule 10b-5.  In Mutual Shares, the plaintiffs alleged that defendants acquired 94.6%

of the stock in S. H. Kress and Company ("Kress"), deceived plaintiffs into buying shares of

stock in Kress, which plaintiffs held at the time of the complaint, and continued to defraud them

by operating Kress against its corporate interest to the detriment of the minority shareholders.

Id. at 542.  The Second Circuit held that the fact that the plaintiffs had not sold their shares at a

depressed price did not bar the claim for injunctive relief.  "The complaint alleges a manipulative

scheme which is still continuing.  While doubtless the Commission could seek to halt such

practices, present stockholders are also logical plaintiffs to play an important role in enforcement

of the Act in this way."  Id. at 546-47.  The Second Circuit distinguished claims for damages

under 10b-5, noting that

> the claim for damages on this theory founders both on
> proof of loss and the causal connection with the alleged
> violation of the Rule; on the other hand, the claim for
> injunctive relief largely avoids these issues, may cure harm
> suffered by continuing shareholders, and would afford
> complete relief against the Rule 10b-5 violation for the
> future.

Id. at 547.

### ii.   Second Circuit Law after Blue Chip

Blue Chip was decided eight years after Mutual Shares, and the Second Circuit

has not explicitly ruled on the question of whether claims for injunctive relief pursuant to section

10(b) or Rule 10b-5 may be brought when the plaintiff is neither a purchaser nor seller of

securities on a domestic market.  Some courts have relied on Crane Co. v. American Standard,

Inc., 603 F.2d 244 (2d Cir. 1979) ("Crane III"), for the proposition that Mutual Shares survived

Blue Chip.  But that was not the holding of Crane III.  In Crane III, the Second Circuit, relying

on Piper v. Chris-Craft Indus., 430 U.S. 1 (1977), found that Crane, a tender offeror, did not have

standing to sue for damages under 10(b) and Rule 10b-5. Crane III, 603 F.2d at 251. The court

noted that "we adhere to our ruling in Crane I that Crane had standing to sue for injunctive relief

. . . ." Id. at 251 n.15. In Crane Co v. Westinghouse Air Brake Company, 419 F.2d 787, 798 (2d

Cir. 1969) ("Crane I"), relying on Vine v. Beneficial Finance Co., 374 F.2d 627, 635 (2d Cir.

1967), the court found that Crane, a holder of Air Brake stock, had standing for injunctive relief,

because Crane was a minority shareholder in a short-form merger who would be forced to sell its

shares for cash. "The effect of Standard's deception and manipulation was to deter Air Brake

shareholders from tendering to Crane. The success of Standard's maneuver made Crane a forced

seller of the newly issued Standard convertible preferred under threat of a divestiture action to be

brought by Standard under the antitrust laws." Crane I, 419 F.2d at 798. See Crane Co v.

American Standard, Inc., 490 F.2d 332, 336 (2d Cir. 1973) ("Crane II").

      The Second Circuit's holding in Crane I relied on the Vine "forced seller"

exception to the Birnbaum rule. In Vine, the Second Circuit held that if, in the context of a

short-form merger, a plaintiff would be forced to sell his shares of a corporation, by either the

tender offer provided or appraisal rights, the plaintiff became party to a "sale" of securities.

"Since, in order to realize any value for his stock, appellant must exchange the shares for money

from appellee, as a practical matter appellant must eventually become a party to a 'sale,' as that

term has always been used." Vine, 374 F.2d at 634. Accordingly, the Second Circuit found that

the plaintiff had alleged a "sale." Unlike in Crane I ("The present case falls within the rationale

of Vine, where we held that a minority shareholder in a short form merger is a 'seller' since he is

entitled only to cash for his shares"), and Crane III, the Vine rationale is not at issue here, as

shareholders of CorpBanca, including the plaintiff, will continue to hold shares of the surviving

corporation after the merger is consummated.

Since Crane III, the Second Circuit has twice touched upon in dicta the issue of standing for non-purchasers or sellers seeking injunctive relief under section 10(b) and Rule 10b-5.  In United States v. Newman, 664 F.2d 12 (2d Cir. 1981), the court reversed the district court's dismissal of a criminal indictment charging the defendant with violations of section 10(b) and Rule 10b-5.  The court held that in a criminal prosecution, a fraud perpetrated upon purchasers or sellers of securities was not a requisite element of the crime of securities fraud, noting that "[l]ong before appellee undertook to participate in the fraudulent scheme alleged in the indictment, this Court, and other Courts of Appeals as well, had held that a plaintiff need not be a defrauded purchaser or seller in order to sue for injunctive relief under Rule 10b-5.  These holdings were consistent with the language of Rule 10b-5, which contains no specific requirement that fraud be perpetrated upon the seller or buyer of securities."  Id. at 17.  (citing Crane III, 419 F.2d at 789; Mutual Shares, 384 F.2d at 546-47; Kahan v. Rosenstiel, 424 F.2d 161, 173 (3d Cir. 1970); Britt v. Cyril Bath Co., 417 F.2d 433, 436 (6th Cir. 1969)).  This statement, made in a criminal case, does not constitute a Second Circuit holding that the Mutual Shares exception survived Blue Chip.

Perhaps the clearest statement that the issue remains open in this Circuit comes from the Second Circuit itself.  In Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc., 186 F.3d 157 (2d Cir. 1999), the late Judge Milton Pollack imposed Rule 11 sanctions upon both DeBartolo and its counsel for filing a lawsuit which alleged that defendants had violated Rules 10b-5 and 10b-13, and sought, in part, injunctive relief.  Judge Pollack found that DeBartolo lacked standing to sue because it was neither a purchaser nor seller of the securities at issue.  The Second Circuit reversed the sanction as to the Rule 10b-5 claim, noting that "Crane provides at least a good faith basis for DeBartolo's assertion of standing."  Id. at 171.  But the Second

Circuit explicitly refrained from holding that DeBartolo had standing: "[t]o be clear, we do not hold that DeBartolo had standing to seek an injunction; that issue is not before us.  We hold only that, as an external competitor seeking only injunctive relief, DeBartolo arguably had standing under Crane."  Id.  It noted that:

> we have recognized that the [Blue Chip Stamps-Birnbaum] rule does not necessarily extend to actions seeking injunctive relief.  In Crane III, although we concluded that a disappointed tender offeror could not assert a claim for damages under Rule 10b-5 because it was not itself a defrauded investor, we nonetheless found that plaintiff had standing to assert a claim for injunctive relief.

Id. at 170 (citation omitted).

Since Blue Chip, the Second Circuit has not explicitly ruled on the question of whether claims for injunctive relief pursuant to section 10(b) and Rule 10b-5 may be brought where the plaintiff is neither a purchaser nor seller of securities on a domestic market.  This Court holds that Mutual Shares has been overruled by Blue Chip.  This conclusion is consistent with the observations of Judge Cote.  Global Intellicom, Inc., 1999 WL 544708, at *8.[3]  On the other hand, some courts in this district have read Second Circuit precedent as authorizing plaintiffs to bring injunctive claims pursuant to section 10(b) and Rule 10b-5 even absent a connection to a "purchase or sale" of securities.  Fuchs v. Swanton Corp., 482 F. Supp. 83, 89 (S.D.N.Y. 1979) (Sand, J.); Langner v. Brown, 913 F. Supp. 260, 270 (S.D.N.Y. 1996) (Sand, J.) ("well-established Second Circuit precedent hold[s] that, in seeking injunctive relief under a § 10(b) claim, a plaintiff does not have to show damages in connection with the purchase or sale of any security.") (citing Mutual Shares and Packer v. Yampol, 630 F. Supp. 1237, 1242 (S.D.N.Y.

---

[3] The opinion in Global Intellicom was issued the day before the Second Circuit issued DeBartolo.  DeBartolo, a partial reversal of a sanction order, is not an authorization of the plaintiff's action for injunctive relief.

1986) (Connor, J.) (noting in dicta that "courts have stated that shareholders who were not purchasers or sellers may bring 10b-5 actions for injunctive relief.")).[4]

c.   <u>The Holdings of Other Circuits</u>

Only one circuit has reached the precise question of whether <u>Blue Chip</u> bars an injunctive claim under section 10(b) and Rule 10b-5, absent a connection to a "purchase or sale" of securities.  In <u>Cowin v. Bresler</u>, 741 F.2d 410 (D.C. Cir. 1984), the District of Columbia Circuit held that a minority shareholder who had not alleged a relevant purchase or sale of securities lacked standing to seek injunctive relief pursuant to section 10(b) and Rule 10b-5, concluding that, "[w]hile it may be possible to discern differences between an action for damages and a suit for an injunction, most of the Supreme Court's argument in <u>Blue Chip</u> applies quite as much to the latter as to the former."  <u>Id.</u> at 424.

The court stated that "the question of what constitutes the proper plaintiff class under section 10(b) and Rule 10b-5 cannot be <u>conclusively</u> determined by resort to the text of those enactments; as one might expect, neither the statute nor the rule speaks directly to the question of who may sue since the right to sue was created afterwards by the judiciary."  <u>Id.</u> (emphasis in original).  Further, the court noted that "[s]till, in the process of implying private rights, judges must take account of the statutory scheme.  No better guidance exists than the language of the relevant statute and regulation."  <u>Id.</u> (citations omitted).  It held that "the relaxed standing requirement . . . would be contrary to the rationale of section 10(b) and Rule 10b-5 as perceived by the Supreme Court in <u>Blue Chip</u>."  <u>Id.</u>

---

[4] In <u>Packer</u>, plaintiffs alleged that they had made purchases based on misrepresentations.  630 F. Supp. at 1239.  The district court found that the complaint failed to allege an injury.  Judge Connor rejected the plaintiff's argument that "so long as the plaintiff is an owner of the affected securities, he has standing to sue to enjoin fraudulent practices."  <u>Id.</u> at 1242.

The D.C. Circuit also rejected the plaintiff's argument that relaxing the purchaser-seller requirement would not contradict the policy rationale set forth in Blue Chip.  "If we thought this question open, we might conclude that injunctive suits present many of the same problems of vexatiousness, 'strike' suits, abuse of discovery, and the like that damage actions do.  We need not decide that, however, for we think the approach appellant suggests is foreclosed by Blue Chip itself."  Id. at 424-25.  Further, the court stated that "[i]n cases of doubt, the institutional role of the Supreme Court weighs in favor of considering its rulings to be general rather than limited to the particular facts."  Id. at 425.  "[In Blue Chip] . . . the Court gave every indication that it wished to speak broadly."  Id.  The D.C. Circuit concluded that Blue Chip applied to claims for injunctive relief.

Other circuits have stated in dicta that a plaintiff seeking injunctive relief would have standing pursuant to Rule 10b-5.  The Fifth Circuit approved of Mutual Shares in dicta after Blue Chip.  Davis v. Davis, 526 F.2d 1286, 1290 (5th Cir. 1976) ("[T]he element of specificity that accompanies a strict insistence on a purchase or sale . . . is not as critical in a suit for injunctive relief as it is where damages are sought.").  See also Pelletier v. Stuart-James Co., Inc., 863 F.2d 1550, 1558 n.15 (11th Cir. 1989) (noting, in dicta, that "The[] policy considerations [at issue in Blue Chip] would not require the dismissal of a suit for injunctive relief, however, since a plaintiff seeking an injunction is quite often successful precisely because he cannot calculate the damages he suffers").

A number of circuits have declined to address the open question of whether Blue Chip applies to purely injunctive claims.  See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 486 (3rd Cir. 1998) ("[W]e have yet to decide whether a non-purchasing or non-selling plaintiff continues to have standing to seek injunctive relief for an

alleged 10b-5 violation after <u>Blue Chip Stamps</u>.  However, resolution of that question must await

yet another day as we need not now decide it to resolve the case at bar."); <u>Advanced Resources</u>

<u>Intern., Inc. v. Tri-Star Petroleum Co.</u>, 4 F.3d 327, 332 (4th Cir. 1993) ("We need not today

decide whether to endorse the exception to the <u>Blue Chip</u> standing rule . . . ."); <u>Westinghouse</u>

<u>Credit Corp. v. Bader & Dufty</u>, 627 F.2d 221 (10th Cir. 1980) ("We do not feel compelled to

here decide whether the rule of <u>Blue Chip Stamps</u> applies to a private action under Rule 10b-5

which is purely injunctive in nature, . . . .")

       d.  <u>Application of the Blue Chip Rule to this Case</u>

             i.  Statutory Requirement of Purchaser or Seller Status is the
                <u>Same in the Case of a Claim for Injunctive Relief</u>

        The language of the statute and the explicit holding of the Supreme Court in <u>Blue</u>

<u>Chip</u> lead this Court to conclude that <u>Blue Chip</u> bars claims for injunctive relief absent a

purchase or sale of securities.  There is no reason to depart from the express holding of <u>Blue</u>

<u>Chip,</u> which notably is not limited to damage actions: "We therefore hold that respondent was

not entitled to sue for violation of Rule 10b-5. . . ." <u>Id.</u> at 755.  As the D.C. Circuit stated, the

statutory limitation, the structure of the '34 Act, and the refusal of Congress to expand the

language of section 10(b) and Rule 10b-5 "constrain us to accept, in the context of an injunctive

suit, the common meaning of the terms 'purchase or sale' and reject an expansive construction of

the Rule, as <u>Blue Chip</u> did for damage actions."  <u>Corwin</u>, 741 F.2d at 424.

             ii.  The Policy Considerations Also Favor Application of the Rule
                <u>to Claims for Injunctive Relief</u>

        Many of the same policy concerns raised by the Court in <u>Blue Chip</u> remain

applicable to a claim for injunctive relief.  While some of the concerns have been mitigated by

the amendments to Rule 11, Fed. R. Civ. P., introduced in 1983, and the Private Securities

Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, there are serious concerns presented by

claims for injunctive relief by asserted by mere holders of shares.   A federal securities suit for money damages under Rule 10b-5 often derives its settlement clout because it is brought as a class action.  By invoking Rule 23, Fed. R. Civ. P., the size of the claim may be vastly expanded.  However, the claim is subject to the dictates of Rule 23, which provide important judicial oversight.  There must be a finding that the representative parties will fairly and adequately protect the class.  Rule 23(a)(4).  The appointment of class counsel is subject to judicial review, and counsel must fairly and adequately represent the interests of the class.  Rule 23(g).  A certified class action may not be settled or voluntarily dismissed without compliance with rigorous procedural and substantive requirements.  Rule 23(e).

In contrast, a single shareholder seeking to invoke Rule 10b-5 to enjoin a transaction owes no duty to anyone else. The transaction may be highly advantageous to other shareholders but, short of seeking to intervene in the action, these other shareholders have no say in the matter. The suing single shareholder may at any time settle the claim or voluntarily dismiss the claim in exchange for payment of a sum of money measured not by the potential harm to that individual shareholder but by the potential injury to the defendant—or its other shareholders—in having the overall transaction enjoined.  The danger of abuse is self-evident and the tools present under Rule 23 are not available to the Court.

Additionally, in the prototypical Rule 10b-5 action, the plaintiff has suffered a loss because he or she bought at a price inflated by a fraudulent misstatement or non-disclosure and sold at a lower price after the truth was disclosed.  Here, the plaintiff purports to have alleged a fraud by defendants.  Presumably, through the public filing of the complaint, much of the world now knows of the supposed fraud.   Necessarily, the plaintiff can no longer be reasonably relying upon the offending statements by defendants.  As Judge Conner noted, "[i]f

such corrective disclosures were ordered, they would almost certainly cause the price of [the] stock to drop.  Thus, ironically, the very relief that plaintiffs seek could become the cause of their only injury."  Packer, 630 F. Supp. at 1241.

Not all policy concerns cut in favor of barring a holder from bringing a claim for injunctive relief.  As Judge Friendly has noted, injunctive relief has the great efficiency of permitting the lawfulness of a course of conduct to be tested before closing.  Elec. Specialty Co. v. Int'l Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969).  But, in cases such as this one, the SEC has the ability to seek injunctive relief.  15 U.S.C. § 78u(d)(1); SEC v. National Securities, Inc., 393 U.S. 453, 467 n.9 (1969).  Neither before nor since Blue Chip have private injunctive actions under Rule 10b-5 by mere holders of a security been a material part of the regulatory landscape.

Also, on a claim for injunctive relief, fact finding is conducted exclusively by the court.  Thus, the fact finder for "hazy issues of historical fact the proof of which depended almost entirely on oral testimony" would be a court and not a jury.  Blue Chip, 421 U.S. at 743.

The Blue Chip majority noted that the policy considerations were not all one-sided in that case, id. at 738-39, 749, nor are they here. But, on balance, the Court comfortably concludes that policy considerations of the type that underlie the holding in Blue Chip apply with equal force here.

### iii.  Cartica is not a Purchaser or Seller within the Meaning of Section 10(b) or Rule 10b-5

"Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."  Morrison v. National Australia Bank Ltd., 561 U.S. 247, 273 (2010).  CorpBanca stock is listed on the Santiago Stock Exchange and the Chilean Electronic Exchange.  (Am. Compl. ¶ 39.)  CorpBanca

ADRs are traded on the NYSE.  (Am. Compl. ¶ 40.)  Cartica purchased CorpBanca ADRs on January 18, 2013, about a year before the proposed merger was announced.  (Am. Compl. ¶ 33.)  These purchases could not have been in connection with false statements about the yet-to-be disclosed merger.  "In December 2013 and early January 2014," Cartica "purchased an additional 188 million CorpBanca shares" and "[i]n February 2014 . . . Cartica purchased an additional 2 billion CorpBanca shares."  (Am. Compl. ¶¶ 103, 105.)  These purchases are not alleged to have been made in the United States, and do not, under Morrison, qualify as purchases under section 10(b).

Cartica bases its section 10(b) and Rule 10b-5 claim solely on "its ownership of CorpBanca ADRs traded on the NYSE."  (Mem. in Opp. at 17 n.5.)  Cartica did not allege that it purchased or sold shares in a transaction based in the United States in connection with the alleged misrepresentations or omissions.  Cartica's purchase of CorpBanca ADRs occurred prior to the alleged misrepresentations or omissions.  Cartica's extraterritorial purchases are not within the reach of section 10(b).  Cartica has not alleged a purchase or sale of a security in connection with its claim pursuant to section 10(b) or Rule 10b-5.

Accordingly, Cartica's claim pursuant to section 10(b) and Rule 10b-5 will be dismissed.

IV. The Section 13(d) Claim for Injunctive Relief

The Amended Complaint, filed on June 12, 2014, alleges that Saieh, Corp Group, and Itaú formed a "group" as defined by 17 C.F.R. § 240.13d-5(b)(1) by entering into the Transaction Agreement, and thus incurred obligations to file a Schedule 13D.[5]  The Transaction

---

[5] As a shareholder, Cartica has standing to bring a claim for a violation of Section 13(d), which has no purchaser or seller requirement. Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 62 (1975); GAF Corp. v. Milstein, 453 F.2d 709, 719 n.21 (2d Cir. 1971).  The Court assumes without deciding that it has jurisdiction over the Itaú defendants and that they were properly served.

Agreement provides that (i) Corp Group and CorpBanca Colombia will vote their shares of

CorpBanca common stock and CorpBanca Colombia common stock in favor of the transactions

and against any acquisition proposals; and (ii) Corp Group and CorpBanca will not transfer any

shares of CorpBanca or CorpBanca Columbia stock or take any action that would result in Corp

Group or CorpBanca not having the "full and exclusive power to vote such shares."  (Slocum

Decl. Ex. 8.1 § 4.4(g).)

   Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), requires "beneficial

owners" to disclose the acquisition of beneficial ownership of more than five percent of a

company's equity securities within ten days of purchase.  "[T]he goal of § 13(d) is to alert the

marketplace to every large, rapid aggregation or accumulation of securities . . . which might

represent a potential shift in corporate control."  CSX Corp. v. Children's Inv. Fund Mgmt (UK)

LLP, 654 F.3d 276, 286 (2d Cir. 2011) (quoting Treadway Cos, Inc. v. Care Corp., 638 F.2d 357,

380 (2d Cir. 1980)).  "[T]he interests that section 13(d) protects 'are fully satisfied when the

shareholders receive the information required to be filed.'"  Id.

   a. Post-Amended Complaint Disclosures

   CorpBanca and Itaú have filed Schedule 13D disclosures in response to Cartica's

allegations.  On May 29, 2014, the Corp Group defendants filed a Schedule 13D.[6]  (Slocum

Decl. Ex. 12.)  On June 24, 2014, the Corp Group defendants filed an amendment to the

Schedule 13D filed on May 29, 2014.  (Slocum Decl. Ex. 15.)  The amendment noted that:

> Certain third parties have alleged that the Reporting
> Persons may be deemed to be members of a "group" within
> the meaning of Section 13(d) of the Securities Exchange
> Act of 1934, as amended, with Itaú Unibanco Holding S.A.
> and Banco Itaú Chile as a result of the arrangements in the

---

[6] The disclosure, filed on May 29, 2014, listed May 14, 2009 as the triggering date for the filing.  15 U.S.C. § 78m(d)(1) requires a party to file a Schedule 13D disclosure within ten days of the triggering date.  However, once disclosure is made, the interests which section 13(d) protects are satisfied.  See CSX Corp., 654 F.3d at 286.

> Transaction Agreement. The Reporting Persons expressly
> disclaim membership in a group with Itaú Unibanco
> Holding S.A. and Banco Itaú Chile as of the date hereof.
> The Reporting Persons, however, expect that they will
> become members of a "group" with Itaú Unibanco Holding
> S.A. upon the closing of the merger contemplated by the
> Transaction Agreement and the Reporting Persons'
> entering into the Itaú Shareholders Agreement with Itaú
> Unibanco Holding S.A. in connection with the closing of
> the merger.

(Slocum Decl. Ex. 15 at 3.)

On July 7, 2014, Itaú Unibanco Holding S.A. filed a Schedule 13D relating to the

common shares of CorpBanca. (Rodriguez Decl. Ex. 3.) The Itaú Schedule 13D noted that

Cartica's complaint alleged that Itaú and Itaú Chile each acquired beneficial ownership of the

CorpBanca common stock owned by Corp Group. The Schedule 13D disclaimed beneficial

ownership of such shares. (Rodriguez Decl. Ex. 3.) Additionally, the Itaú Schedule 13D

disclosed that:

> Furthermore, the Cartica Complaint alleges that the
> Reporting Person, along with Itaú Chile, Gasa, ICGI and
> Álvaro Saieh Bendeck, a citizen of the Republic of Chile,
> constitute a "group" under Section 13(d) of the Exchange
> Act as a result of certain provisions of the Transaction
> Agreement. The Reporting Person (on behalf of itself and
> its subsidiaries, including Itaú Chile) expressly disclaims
> membership in such a group at all times since the execution
> of the Transaction Agreement and as of the date hereof.
> The Reporting Person, however, expects that it will become
> members of a "group" with CGHI, ICGI, Gasa, CGB and
> Saga upon the Reporting Person's entering into the Itaú
> Shareholders Agreement with such persons in connection
> with the closing of the Chilean Merger.
>
> To the Reporting Person's knowledge, no shares of
> Common Stock are beneficially owned by any of the
> Controlling Shareholders or the persons identified in Annex
> A.
>
> The Reporting Person is not (i) entitled to any rights as a
> stockholder of the Issuer with respect to any shares of

> Common Stock and (ii) has no power to vote, direct the
> voting of, dispose of, or direct the disposal of, any shares of
> Common Stock other than the power provided pursuant to
> the Transaction Agreement.

Id.  The Itaú Schedule 13D also stated that "[n]othing in this Statement shall be construed as an

admission that any transaction described herein took place in the United States or that Section

13(d) of the Exchange Act applies extraterritorially to any of the Reporting Person or to the

Reporting Person's (or Itaú Chile's) entry into the Transaction Agreement."  Id.

      The June and July disclosures have cured any inadequacies in the previously filed

Schedule 13D and the market has had more than ample time to absorb the information.  The

transaction was announced in January.  The Transaction Agreement and Shareholders Agreement

were made public in March.  Corp Group and Itaú filed their Schedule 13D disclosures and

amendments in May, June, and July 2014.  The defendants have maintained that a shareholder

vote would not be held until at least September 2, 2014, and is expected to occur sometime in

November 2014.  (Docket # 49, 117.)  "When . . . a corrective filing is made and adequate

opportunity is provided for the information that it contains to be digested by shareholders, the

corrective injunction should be terminated."  ICN Pharmaceuticals, Inc. v. Khan, 2 F.3d 484, 489

(2d Cir. 1993).  The Schedule 13D disclosures were made with ample time for shareholders to

review prior to a shareholder vote.  See Drobbin v. Nicolet Instrument Corp., 631 F. Supp. 860,

914 (S.D.N.Y. 1986) (enjoining defendant from voting shares until ten days after disclosure).

      **b.  Group Status**

      "When two or more persons agree to act together for the purpose of acquiring,

holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be

deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act,

as of the date of such agreement, of all equity securities of that issuer beneficially owned by any

such persons."  17 C.F.R. § 240.13d-5(b)(1).  Cartica claims that Corp Group and Itaú have not

made adequate or curative disclosures in their Schedule 13D filings because those filings refute

Cartica's allegation that they have entered into a "group."  Cartica argues that in ruling on a Rule

12(b)(6) motion, the Court must accept as fact its allegation that Itaú and Corp Group formed a

group for the purposes of section 13(d).  "The questions of (a) whether two or more persons

'act[ed]' as a group or agreed to act together, and (b) whether their purpose was the acquisition,

holding, or disposition of an issuer's equity securities are questions of fact."  Roth v. Jennings,

489 F.3d 499, 508 (2d Cir. 2007).  "[T]he alleged group members need not be committed to

'acquiring, holding, voting, or disposing of equity securities' on certain specified terms, but

rather they need only have combined to further a common objective regarding one of the just-

recited activities."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 124 (2d Cir. 2001).  Cartica

alleges that the Transaction Agreement made Corp Group and Itaú a group pursuant to the

securities laws, a fact they have not admitted in their disclosures.

        The Court need not determine whether Cartica has plausibly alleged that the Corp

Group defendants and Itaú have formed a group.  "Any person may expressly declare in any

statement filed that the filing of such statement shall not be construed as an admission that such

person is, for the purposes of section 13(d) or 13(g) of the Act, the beneficial owner of any

securities covered by the statement."  17 C.F.R. § 240.13d-4.  Additionally, a party is not

required to admit allegations in a Schedule 13D that it disputes in good faith.  Taro Pharm. Indus.

Ltd. v. Sun Pharm. Indus. Ltd., 09-cv-8262, 2010 WL 2835548, at *13 (S.D.N.Y. July 13, 2010).

The defendants have a good faith basis for disputing "group" status.  Although the Second

Circuit has not ruled on whether a person can be a member of a "group" without being a

"beneficial owner," a court in this district and two circuits have held that beneficial ownership of

the equity securities is necessary in order to be a member of a "group" as defined in section 13(d). Transcon Lines v. A.G. Becker Inc., 470 F. Supp. 356, 373 (S.D.N.Y. 1979) ("[I]n light of the purpose of Section 13(d) as evidenced by the legislative history and as interpreted by other courts in analogous cases, the better rule is that one who is not the beneficial owner of any shares of the subject company is not a member of a group within the meaning of Section 13(d)(3)."); Rosenberg v. XM Ventures, 274 F.3d 137, 145 (3d Cir. 2001) ("[O]ne who does not have beneficial ownership of the equity securities of an issuer cannot be a member of a group of individuals that do have beneficial ownership."); Hemispherx Biopharma, Inc. v. Johannesburg Consol. Inv., 553 F.3d 1351 (11th Cir. 2008) ("[A] beneficial ownership interest in securities is necessary to become a member of a group within the meaning of section 13(d)(3) of the Exchange Act.").

Cartica alleges that Itaú has beneficial ownership of CorpBanca stock through the Transaction Agreement. The defendants argue that Cartica has not plausibly alleged that the Corp Group defendants have entered into a group with Itaú because Itaú is not alleged to be a beneficial owner of CorpBanca securities as that term is defined by the SEC's regulations. A beneficial owner of a security:

> includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
>
> > (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or
> >
> > (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a).

"[B]eneficial ownership can arise out of 'arrangements,' 'relationships,' and 'devices,' as well as 'contracts' and 'understandings.'"   <u>S.E.C. v. Drexel Burnham Lambert, Inc.</u>, 837 F. Supp. 587, 608 (S.D.N.Y. 1993).  "[T]he inquiry focuses on any relationship that, <u>as a factual matter</u>, confers on a person a significant ability to affect how voting power or investment power will be exercised, because it is primarily designed to ensure timely disclosure of market-sensitive data about changes in the identity of those who are able, as a practicable matter, to influence the use of that power."   <u>Id.</u> (emphasis in original) (quotation marks and citation omitted).  The Court need not determine whether the Transaction Agreement confers beneficial owner status on Itaú.  A beneficial owner must have either "voting power" or "investment power" as defined by 17 C.F.R. § 240.13d-3.  The Transaction Agreement does not provide Itaú with either voting power or investment power – it explicitly notes that Corp Group will direct the voting of its shares and the shares of CorpBanca Colombia.  The Transaction Agreement states that Corp Group retains "the full and exclusive ability to vote" its CorpBanca shares.  It contractually obligates Corp Group to vote its shares in favor of the transaction, but it does not shift "voting power" or "investment power" to Itaú.  Because the agreement does not explicitly provide Itaú with the rights of a beneficial owner, Cartica's allegation that the defendants have formed a group is not controlling.

At most, there is a disputed question as to whether Corp Group and Itaú have formed a group.  Corp Group and Itaú have made adequate disclosures in their Schedule 13D filings which both note Cartica's contentions in this action and refute the contentions.  "When, as here, the record demonstrates that there is a dispute as to the facts, the law requires only that the disputed facts and possible outcomes be disclosed.  This is the limit of the law unless there is reason to believe that the facts are not genuinely in dispute.  In the case at hand, there is no

reason to believe that they are not genuinely in dispute."  Avnet, Inc. v. Scope Indus., 499 F.

Supp. 1121, 1125-26 (S.D.N.Y. 1980).  The disclosures, which explain Cartica's complaint,

refute the allegations, and disclaim that Itaú has formed a group with the Corp Group defendants,

were sufficient.  Itaú's Schedule 13D disclosure disclaimed beneficial owner status of

CorpBanca securities.

Additionally, the Schedule 13Ds put investors on notice of the fact that Itaú and

Corp Group will form a "group" upon the closing of the transaction.  Because the Shareholders

Agreement has not yet been signed, and will not be signed until the transaction closes, it is

reasonable for Corp Group and Itaú to state that they have not yet formed a group as defined in

section 13(d).  In the interest of disclosure, the Schedule 13Ds disclose the expectation that they

will form a group upon closing.  As in Avnet, an admission at this point by the defendants that

Itaú is a "beneficial owner" of CorpBanca securities or a member of a "group" with the Corp

Group defendants "may actually render the Schedule 13D false."  Avnet, 499 F. Supp. at 1126.

Accordingly, Cartica's claim pursuant to section 13(d) and Rule 13d-1 and 13d-5

will be dismissed.

V.  Section 20(a) Liability

"To establish a prima facie case of control person liability, a plaintiff must show

(1) a primary violation by the controlled person, (2) control of the primary violator by the

defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the

controlled person's fraud."  ATSI, 493 F.3d at 108.  Because the complaint fails to plead a

primary violation of section 10(b), Rule 10b-5, section 13(d), Rule 13d-1 or Rule 13d-5, the

Section 20(a) claims will be dismissed.

VI. Common Law Fraud Claim

The Court has dismissed Cartica's federal securities claims.  Cartica pleads that the Court maintains subject matter jurisdiction over the Count V, the common law fraud claim, pursuant to 28 U.S.C. § 1332(a)(3).  Cartica has improperly pled jurisdiction.  (Am. Compl. ¶ 27.)  Plaintiffs include a limited liability company and limited partnership.  (Am. Compl. ¶¶ 31-32.)  For the purpose of determining whether diversity jurisdiction exists, an LLC or an LP is considered to have the citizenship of all of its members.  Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 49 (2d Cir. 2012), Herrick Co., Inc. v. SCS Commc'ns, Inc., 251 F.3d 315, 322 (2d Cir. 2001).  Plaintiff Cartica Capital Partners Master, LP, has partners who are citizens of the Bailiwick of Jersey and the Cayman Islands.  (Slocum Decl. Ex. 14 ¶ 4.)  Cartica has not alleged that any defendant is a citizen of the United States.  "[D]iversity is lacking . . . where on one side there are citizens and aliens and on the opposite side there are only aliens."  Universal Licensing Corp. v. Paola del Lungo S.p.A., 293 F.3d 579, 581 (2d Cir. 2002).

Accordingly, jurisdiction over Cartica's state law claim is premised on 28 U.S.C. § 1367(a).  A district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."  28 U.S.C. § 1367(c)(3).  The Second Circuit has made clear that the Court's discretion "is not boundless."  Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003).  "In deciding whether to exercise jurisdiction over supplemental state-law claims, district courts should balance the values of judicial economy, convenience, fairness, and comity—the 'Cohill factors.'"  Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y., 464 F.3d 255, 262 (2d Cir. 2006) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered

under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." Cohill, 484 U.S. at 350 n.7.

Because Cartica's federal claims are herein dismissed and none of the Cohill factors supports exercising supplemental jurisdiction over the remaining state law claim, plaintiff's state law claims will be dismissed without prejudice.

CONCLUSION

For the foregoing reasons, the motions to dismiss brought by defendants CorpBanca S.A., Álvaro Saieh Bendeck, Corp Group Banking S.A., and Saga (Docket # 60) and Itaú Unibanco Holding S.A. and Banco Itaú Chile (Docket # 78) are granted, and the amended complaint is dismissed. As all claims are dismissed against all defendants, the directors and officers' supplemental motion to dismiss (Docket # 64) is granted. The Court need not reach the alternate grounds for dismissal asserted by defendants, including that the Amended Complaint does not meet the pleading standards of Rule 9(b), Fed. R. Civ. P., or the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        September 25, 2014